**UNITED STATES COURT OF INTERNATIONAL TRADE**

**DEACERO S.A.P.I. DE C.V.;**
**DEACERO USA, INC.; and**
**INGETEK USA, LLC**

*Plaintiffs,*

**v.**

**UNITED STATES; UNITED STATES DEPARTMENT OF COMMERCE; HOWARD W. LUTNICK, in his official capacity as Secretary of Commerce; UNITED STATES CUSTOMS AND BORDER PROTECTION; and RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection,**

*Defendants.*

**Court No.** 26-03951

**NON-CONFIDENTIAL**

**COMPLAINT**

Plaintiffs Deacero S.A.P.I. de C.V. ("Deacero SAPI"), Deacero USA, Inc. ("Deacero USA"), and INGETEK USA, LLC ("INGETEK USA") (collectively, "Plaintiffs"), by their undersigned counsel, allege as follows:

**NATURE OF THE ACTION:**

1. This action challenges the reimposition, escalation, and implementation of tariffs under Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862 ("Section 232"), on steel articles and derivative steel articles from Mexico.

2. On February 10, 2025, Presidential Proclamation 10896 purported to terminate the United States' existing arrangement with Mexico and subjected covered Mexican steel to an additional 25 percent ad valorem tariff, effective March 12, 2025. *Adjusting Imports of Steel Into the United States, Proclamation No. 10896*, 90 Fed. Reg. 9,817 (published Feb. 18, 2025) ("Proclamation 10896").

3. On June 3, 2025, Presidential Proclamation 10947 doubled that tariff from 25 percent to 50 percent, effective the following day. *Adjusting Imports of Aluminum and Steel Into the United States, Proclamation No. 10947*, 90 Fed. Reg. 24,199 (published June 9, 2025) ("Proclamation 10947").

4. Plaintiffs also challenge the agency actions implementing those proclamations and Presidential Proclamation 11021, issued April 2, 2026, to the extent it expanded the tariff base or otherwise increased the Section 232 liability imposed on Plaintiffs' merchandise. *Strengthening Actions Taken To Adjust Imports of Aluminum, Steel, and Copper Into the United States, Proclamation No. 11021*, 91 Fed. Reg. 18,201 (published Apr. 9, 2026) ("Proclamation 11021").

5. Proclamations 10896, 10947, and 11021 (collectively the "Challenged Measures") did not follow a new Section 232 investigation or a new report by the Secretary of Commerce containing the statutory findings required by 19 U.S.C. § 1862(b). Instead, they relied on the U.S. Department of Commerce ("Commerce") January 2018 steel report[1] (the "2018 Steel Report") – by now nearly seven years old – despite intervening presidential determinations in 2019 and 2024 that Mexico-specific arrangements provided effective, long-term alternatives to tariffs.

[1] U.S. Dep't of Com., Bureau of Indus. & Sec., *The Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended* (Jan. 11, 2018) *available at*: https://www.commerce.gov/sites/default/files/the_effect_of_imports_of_steel_on_the_national_security_-_with_redactions_-_20180111.pdf (accessed Sept. 10, 2026).

6. That history matters. In 2019, the President determined that, under the agreement reached with Mexico, Mexican steel imports would no longer threaten to impair national security. In July 2024, after reviewing increased Mexican imports, the President adopted a new melt-and-pour regime and again determined that the Mexico-specific measures would provide an effective, long-term alternative. Seven months later, Proclamation 10896 discarded that regime and revived the 2018 Steel Report without a new investigation and report.

7. The Federal Circuit has expressly left open whether a Commerce finding may continue to support new Section 232 measures years after the finding was made, without a new investigation and threat determination.[2] This case presents that reserved question.

8. The Challenged Measures also abandoned the distinction previously drawn by the Executive Branch between Mexican steel melted and poured in North America and Mexican products made from steel melted and poured in third countries. Plaintiffs' products are manufactured as part of an integrated North American production chain and fell within the North American category recognized by Presidential Proclamation 10783, *Adjusting Imports of Steel into the United States*, 89 Fed. Reg. 57,347 (published July 15, 2024). Proclamation 10896 nevertheless eliminated that distinction without findings explaining why the targeted mechanism had failed or why North American melt-and-pour steel should be subjected to the same treatment as Mexican products made from steel melted and poured in third countries.

9. The Challenged Measures have caused and continue to cause direct and substantial economic injury to each Plaintiff. Since the tariffs under the Challenged Measures became effective, imports of covered steel products by Deacero USA have declined substantially as a result

[2] *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1310-11 (Fed. Cir. 2021) (expressly declining to address "other circumstances" involving presidential adjustments undertaken "without securing a new report with a new threat finding from the Secretary")).

of the additional costs imposed by the Challenged Measures. Deacero USA, as importer of record, has nevertheless paid substantial Section 232 duties and continues to incur those duties on covered imports. The tariffs also increase costs and impair the utilization and return on the newly constructed Dayton, Texas manufacturing and distribution facility. INGETEK USA, which is also an importer of record, has paid Section 232 tariffs and has suffered its own increased input costs, reduced margins, and lost business opportunities. Finally, Deacero SAPI has suffered reduced competitiveness, sales to the United States, and returns on its U.S. investments.

10. Plaintiffs seek declarations that the Challenged Measures were imposed without satisfying the statutory predicates and procedures required by Section 232 and therefore exceed the authority conferred by that statute. Plaintiffs also seek orders preventing the agency defendants from continuing to implement, administer, or collect those duties as applied to Plaintiffs and their merchandise; directing U.S. Customs and Border Protection ("CBP") to liquidate or reliquidate affected entries without duties pursuant to the Challenged Measures and refund duties paid, with interest; and granting all other relief available by law.

## JURISDICTION, STANDING, AND TIMELINESS

11. This Court has exclusive subject-matter jurisdiction under 28 U.S.C. § 1581(i)(1)(B) because this civil action arises out of laws providing for tariffs and duties on the importation of merchandise for reasons other than the raising of revenue.

12. This Court also has exclusive jurisdiction under 28 U.S.C. § 1581(i)(1)(D) because this action arises out of laws providing for tariffs and duties and challenges their administration and enforcement by Commerce and CBP.

13. No other subsection of 28 U.S.C. § 1581 provides an adequate remedy for Plaintiffs' claims. Plaintiffs do not seek review of a denied protest, an entry-specific classification

decision, or any determination reviewable under 28 U.S.C. § 1581(a)–(h). They challenge the legality of the tariff regime itself and seek prospective relief that a protest proceeding cannot provide.

14. Plaintiffs are entities adversely affected or aggrieved by agency action within the meaning of 28 U.S.C. § 2631(i) and 5 U.S.C. § 702. Each has suffered concrete economic injury that is caused by the Challenged Measures and would be redressed by the requested relief.

15. This Court may grant declaratory and equitable relief under 28 U.S.C. §§ 1585, 2201–2202, and 2643(c)(1), and may review implementing agency action under 5 U.S.C. §§ 702 and 706 to the extent applicable.

16. This action is timely under 28 U.S.C. § 2636(i). Proclamation 10896 first became applicable to covered Mexican steel on March 12, 2025, less than two years before the commencement of this action. The subsequent Challenged Measures became effective later still. This complaint is filed within two years of when each of the Challenged Measures first gave rise to Plaintiffs' claims.

17. The Court has personal jurisdiction over Defendants because they are the United States, agencies of the United States, and officers of the United States sued in their official capacities.

## **THE PARTIES**

18. Plaintiff Deacero SAPI is a corporation organized under the laws of Mexico, with its principal place of business at Avenida Lázaro Cárdenas No. 2333, Colonia Zona Loma Larga Oriente, San Pedro Garza García, Nuevo León 66266, Mexico. It produces and exports long steel products, including [ ]. Deacero SAPI owns and operates steel mills in Mexico that utilize electric-arc-furnace technology to melt and pour steel and

manufacture long steel products for sale in Mexico and export to the United States. Deacero SAPI has made substantial investments in modern steelmaking facilities and related technologies. Its electric-arc-furnace operations produce steel primarily from recycled scrap sourced in Mexico and the United States as part of an integrated North American supply chain, rather than from steel melted and poured in third countries.

19. Deacero SAPI is the direct or indirect owner of Deacero USA and INGETEK USA. Its U.S. subsidiaries and operations constitute substantial investments through which Deacero SAPI serves U.S. customers and performs manufacturing, fabrication, distribution, and related activities.

20. Deacero SAPI and its subsidiaries produce in Mexico and sell for export to the United States steel articles and derivative steel articles covered by the Challenged Measures. These products include, but are not limited to, [

]. These products are classified under various subheadings within HTSUS headings 7213, 7214, 7215, 7216, 7217, 7229, 7308, 7312, 7313, 7314, 7317, 7318, and 7326. Deacero USA and INGETEK USA have imported products within these categories during the period covered by the challenged proclamations and have been required to pay the Section 232 duties imposed on those imports.

21. Plaintiff Deacero USA is a corporation organized under the laws of Texas, with its principal place of business at 8411 Irvington Boulevard, Suite B, Houston, Texas 77022. Deacero USA is a wholly owned subsidiary of Deacero SAPI.

22. Deacero USA imports, manufactures, processes, markets, and distributes steel products in the United States. It is the importer of record and party legally responsible for Section 232 duties on covered entries of the steel articles and derivative steel articles described above.

23. Since March 12, 2025, Deacero USA has deposited or paid Section 232 duties totaling approximately $ [ ], approximately $ [ ] per month on average. These payments are ongoing and legally required as a condition of importing covered merchandise.

24. Deacero USA has made a substantial commitment to a newly constructed manufacturing and distribution facility at 4445 Highway 90 West in Dayton, Texas. Public information describes an approximately [ ] rail-served facility designed to receive [ ] from Mexico for processing into [ ] products in the United States.

25. The tariffs imposed by the Challenged Measures directly impair Deacero USA's Dayton investment and other U.S. operations by increasing input costs, delaying the ramp-up of certain downstream product lines, reducing utilization, and causing planned expansion initiatives to be postponed or canceled.

26. Plaintiff INGETEK USA is a limited liability company organized under the laws of Texas, located at 8411 Irvington Boulevard, Suite B, Houston, Texas 77022. INGETEK USA is a wholly owned subsidiary of Deacero USA that commercializes [ ].

27. INGETEK USA's role in the affected supply chain includes importing covered steel products as importer of record, purchasing covered steel from I.N.G.E.T.E.K.N.O.S. Estructurales,

S.A. de C.V., a wholly owned subsidiary of Deacero SAPI, [ ], and the promotion and maintenance of client relationships.

28. The Challenged Measures directly injure INGETEK USA because it has paid, and continues to pay, substantial Section 232 duties on imports covered by the challenged proclamations. Those duties increase INGETEK USA's costs, impair its profitability, and adversely affect its ability to compete in the U.S. market. Through August 2026, INGETEK USA has paid or deposited approximately $[ ] in Section 232 duties, representing an average monthly burden of $[ ]. This injury is distinct from, and additional to, the injuries suffered by the other Plaintiffs.

29. Together, the three Plaintiffs participate in an integrated North American steel supply and investment structure. Deacero SAPI manufactures steel in its Mexican mills using a North American melt-and-pour production chain; Deacero USA imports and supplies those products in the United States; and INGETEK USA imports and distributes affected products for U.S. customers.

30. Defendant United States is the sovereign against which this action is brought.

31. Defendant Commerce is an executive department of the United States. Commerce administers Section 232 investigations, monitoring, advice, recommendations, and related implementation through the Secretary of Commerce and subordinate offices.

32. Defendant Howard W. Lutnick is the Secretary of Commerce and is sued solely in his official capacity.

33. Defendant CBP is an agency of the United States Department of Homeland Security. CBP collects, administers, and enforces the challenged Section 232 tariffs at entry and liquidation.

34. Defendant Rodney S. Scott is the Commissioner of CBP and is sued solely in his official capacity.

## STATUTORY AND LEGAL FRAMEWORK

35. Section 232 establishes mandatory predicates and procedures before the President may adjust imports on national-security grounds. 19 U.S.C. § 1862.

36. Under Section 232(b), the Secretary of Commerce must initiate an appropriate investigation to determine the effects on national security of imports of the article at issue. The Secretary must consult with the Secretary of Defense and other appropriate officers and, if appropriate, hold public hearings or otherwise afford interested parties an opportunity to present information and advice. 19 U.S.C. § 1862(b)(1)–(2).

37. Within 270 days after initiating the investigation, the Secretary must submit a report to the President stating the findings and recommendations and, if the Secretary finds that the article is being imported in quantities or under circumstances that threaten to impair national security, shall advise the President of such in the report. 19 U.S.C. § 1862(b)(3)(A).

38. After receiving that report, the President has 90 days to determine whether to concur in the Secretary's finding and what action must be taken to adjust imports. If the President decides to act, the President must implement that action within 15 days of deciding to act. 19 U.S.C. § 1862(c)(1).

39. Section 232(c)(3) separately addresses an action consisting of negotiations to limit or restrict imports. If an agreement is not entered into within the statutory period, or if an agreement is not being carried out or is ineffective in eliminating the threat, the President shall take such other actions as the President deems necessary and publish notice in the Federal Register. 19 U.S.C. § 1862(c)(3)(A).

40. The statutory investigation, report, findings, and timing requirements are not optional. They are the conditions Congress imposed before non-revenue tariffs may be exercised in the name of national security.

41. Although the President is not an "agency" under the Administrative Procedure Act ("APA"), courts may review whether presidential action clearly misconstrues the governing statute, violates a significant procedural requirement, or exceeds the authority Congress delegated.[3] Relief is available against the officers and agencies charged with implementing unlawful presidential action.[4]

42. Commerce and CBP must act within their own statutory authority and may not implement or enforce a tariff that exceeds the authority conferred by Section 232. Their final implementing actions are subject to review for statutory and procedural compliance to the extent provided by law.

## FACTUAL BACKGROUND

### A. THE 2018 STEEL INVESTIGATION AND INITIAL ACTION

43. In April 2017, Commerce initiated a Section 232 investigation into the effect of imports of steel mill products on national security.[5]

[3] *See Franklin v. Massachusetts*, 505 U.S. 788, 800–01 (1992) (holding that the President is not an "agency" for purposes of the APA); *PrimeSource Bldg. Prods., Inc. v. United States*, 59 F.4th 1255, 1260 (Fed. Cir. 2023) ("For an asserted statutory violation, review is also available, but it is limited: 'For a court to interpose, there has to be a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority.'" (quoting *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985))); *see also USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1365–66 & n.3 (Fed. Cir. 2022).

[4] *See Chamber of Com. of the U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("[ ]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive." (quoting *Franklin v. Massachusetts*, 505 U.S. 788, 828–29 (1992) (Scalia, J., concurring in part and concurring in the judgment))).

[5] U.S. Dep't of Commerce, Section 232 Notification Letter to Secretary of Defense James Mattis (April 19, 2017), *available at:* https://www.commerce.gov/sites/default/files/media/files/2017/2017-04-19_2.pdf (accessed Sept. 9, 2026).

44. On January 11, 2018, Commerce transmitted its report, the 2018 Steel Report, to the President. The report concluded that steel articles were being imported in quantities and under circumstances that threatened to impair national security and recommended measures intended to support an 80 percent domestic capacity-utilization rate.[6]

45. On March 8, 2018, the President issued Presidential Proclamation 9705, *Adjusting Imports of Steel into the United States*, 83 Fed. Reg. 11,625 (published Mar. 15, 2018) ("Proclamation 9705"), imposing an additional 25 percent tariff on covered steel from most countries and describing a process for country-specific alternatives and later monitoring.

46. No new Section 232 investigation and no new report satisfying 19 U.S.C. § 1862(b)(3)(A) concerning Mexican steel preceded the later Proclamations 10896, 10947, or 11021 announced in 2025 and 2026. Each of these later proclamations instead referred back to the findings in the 2018 Steel Report and to monitoring or information supplied outside a new statutory investigation.

**B. THE UNITED STATES' 2018-2019 ARRANGEMENTS WITH MEXICO**

47. On November 30, 2018, the United States issued a Section 232 Process Side Letter to Mexico.[7] The public U.S. letter states that the United States would not adopt or maintain a Section 232 tariff or import restriction on Mexican goods or services for at least 60 days after imposition of a measure and that, during that period, the two governments would seek to negotiate an appropriate outcome based on industry dynamics and historical trading patterns.[8]

---

[6] *See* Presidential Proclamation 9705, *Adjusting Imports of Steel into the United States*, 83 Fed. Reg. 11,625 (published Mar. 15, 2018).

[7] Off. of the U.S. Trade Representative, *MX-US Side Letter on 232 Process* (Nov. 30, 2018), *available at*: https://ustr.gov/sites/default/files/files/agreements/FTA/USMCA/Text/MX-US_Side_Letter_on_232.pdf (accessed Sept. 10, 2026).

[8] *Id.*

48. On May 17, 2019, the United States and Mexico issued a Joint Statement agreeing to eliminate the Section 232 duties on Mexican steel, monitor trade, prevent transshipment, and address surges.[9] It contemplated that, after a meaningful surge beyond historic volumes, a consultation request, and consultations, the importing party could impose a 25 percent tariff only on the individual product or products where the surge occurred. The listed product categories included reinforcing bar and wire rod.[10]

49. On May 19, 2019, the President issued Presidential Proclamation 9894, *Adjusting Imports of Steel Into the United States,* 84 Fed. Reg. 23,987 (published May 23, 2019) ("Proclamation 9894"). The proclamation found that the United States and Mexico had reached satisfactory alternative means to address the threatened impairment of national security.

50. Proclamation 9894 determined that the measures agreed to with Mexico would provide "effective, long-term alternative means" and that, under the framework of the agreement, Mexican steel imports would "no longer threaten to impair the national security." The President therefore excluded Mexico from the 25 percent tariff.

**C. THE 2024 MEXICO-SPECIFIC MELT-AND-POUR REGIME**

51. In 2024, the executive branch considered an increase in Mexican steel imports and revisited the 2019 arrangements under Proclamation 9894.

52. On July 10, 2024, the President issued Presidential Proclamation 10783, Adjusting Imports of Steel into the United States, 89 Fed. Reg. 57,347 (published July 15, 2024) ("Proclamation 10783"). The proclamation imposed a Mexico-specific melt-and-pour requirement. Mexican-origin steel melted and poured in Mexico, Canada, or the United States

---

[9] Off. of the U.S. Trade Representative, *Joint Statement by the United States and Mexico on Section 232 Duties on Steel and Aluminum* (May 17, 2019), *available at*: https://ustr.gov/sites/default/files/Joint_Statement_by_the_United_States_and_Mexico.pdf (accessed Sept. 10, 2026).
[10] *Id.*

remained exempt from the Section 232 tariff; other Mexican-origin steel became subject to the tariff (hereinafter the "melt-and-pour regime").

53. Proclamation 10783 determined that this new regime would provide "an effective, long-term alternative means" to address any contribution by Mexican steel imports to the threatened impairment of national security by restraining imports, limiting transshipment, and discouraging excess capacity and production.

54. Proclamation 10783 required continued monitoring and directed the United States Trade Representative ("USTR"), in consultation with Commerce, to advise the President if Mexican imports surged and on appropriate means to prevent such imports from undermining the national-security objectives of the 2018 Steel Report.

55. Plaintiffs' steel products are manufactured from steel melted and poured at facilities owned and operated by Deacero SAPI in Mexico. Deacero SAPI produces steel in its own mills in Mexico, using scrap sourced in Mexico and the United States, as part of an integrated North American production chain. Plaintiffs' steel products therefore satisfied the North American melt-and-pour requirement established by Proclamation 10783, rather than falling within the category of Mexican products made from steel melted and poured in third countries.

## D. PROCLAMATION 10896 REIMPOSED TARIFFS ON MEXICAN STEEL

56. Only seven months after issuing Proclamation 10783, on February 10, 2025, the President issued Presidential Proclamation 10896, *Adjusting Imports of Steel Into the United States,* 90 Fed. Reg. 9,817 (published Feb. 18, 2025) ("Proclamation 10896"). This new proclamation terminated the 2019 and 2024 arrangements applicable to Mexico, including Proclamations 9894 and 10783, and subjected covered Mexican steel to the 25 percent tariff beginning March 12, 2025.

57. Proclamation 10896 expressly relied on the January 2018 Steel Report. It did not identify a new Section 232 investigation or a new report containing a current statutory threat finding concerning Mexican steel.

58. The proclamation stated that the Commerce Secretary had supplied monitoring information, including that combined steel imports from Canada and Mexico increased from 7.77 million metric tons in 2020 to 9.14 million metric tons in 2024.

59. The proclamation also asserted that imports of long reinforcing bar from Mexico had increased by 1,678 percent, without disclosing where that data came from. Nor did it disclose the baseline volume, the period and product scope used for that comparison, or whether the imports complied with the 2024 melt-and-pour regime. The proclamation merely stated that the President had been "informed" of these findings by the Commerce Secretary.

60. The proclamation grouped Mexico with numerous countries subject to materially different arrangements and stated generally that those arrangements had failed. It did not explain why the Mexico-specific regime adopted only seven months earlier in Proclamation 10783 was not being carried out or had become ineffective in addressing the asserted national-security threat. Nor did it identify facts arising after July 2024 demonstrating that the North American melt-and-pour requirement had failed to restrain transshipment, distinguish third-country steel, or address the excess-capacity concerns that the mechanism was specifically designed to address. The proclamation likewise did not explain why an across-the-board tariff on all covered Mexican steel was necessary instead of the targeted mechanism previously determined to provide an "effective, long-term alternative means."[11]

---

[11] *See* Proclamation No. 10783, 89 Fed. Reg. 57,347, 57,348-49 (July 15, 2024) (distinguishing Mexican steel melted and poured in the United States, Mexico, or Canada from Mexican steel melted and poured in third countries and determining that the resulting framework would provide an "effective, long-term alternative means" of

61. Proclamation 10896 also did not explain why the materially different categories recognized in Proclamation 10783 should no longer receive different treatment. Its stated concerns regarding Mexico included alleged transshipment and the processing of steel originating outside North America, but Proclamation 10783 had already established an administrable distinction between Mexican products made from North American melt-and-pour steel and those made from steel melted and poured in third countries.[12] Plaintiffs exemplify the practical significance of that distinction. Deacero SAPI manufactures steel in its own Mexican mills using scrap sourced in Mexico and the United States. Proclamation 10896 nevertheless subjected Plaintiffs' products to the same tariff treatment as Mexican products incorporating third-country steel, without findings explaining why those two categories implicated the same national-security concerns.

62. Proclamation 10783, in 2024, also had previously announced that the USTR, in consultation with Commerce, would advise the President if Mexican imports surged and would recommend an appropriate response. Proclamation 10896 identifies information and findings supplied by the Secretary of Commerce, but does not state that the prescribed USTR advice occurred.

63. The tariff became effective 30 days after Proclamation 10896 was issued. That interval was shorter than the 60-day process contemplated in the U.S.-Mexico Section 232 Process Side Letter signed in the context of the USMCA.

addressing the threatened impairment of national security); Proclamation No. 10896, 90 Fed. Reg. 9,817, 9,819-20 (Feb. 18, 2025) (terminating the Mexico-specific arrangement and reimposing tariffs on covered Mexican steel).

[12] *See* Proclamation No. 10783, 89 Fed. Reg. 57,347, 57,347-49 (July 15, 2024) (maintaining duty-free treatment for covered Mexican steel melted and poured in Mexico, Canada, or the United States while imposing duties on Mexican steel melted and poured outside North America and determining that the resulting framework would provide an "effective, long-term alternative means" of addressing the threatened impairment of national security).

### E. PROCLAMATION 10947 DOUBLED THE TARIFF TO 50 PERCENT

64. On June 3, 2025 – less than three months after the 25 percent tariff began – the President issued Presidential Proclamation 10947, *Adjusting Imports of Aluminum and Steel Into the United States,* 90 Fed. Reg. 24,199 (published June 9, 2025) ("Proclamation 10947") doubling the tariff on covered steel from 25 percent to 50 percent effective at 12:01 a.m. the following day.

65. Proclamation 10947 again identified the January 2018 Steel Report as the source of the original threat finding. It referred only to "current information newly provided by the Secretary" and did not identify a new Section 232 investigation, a new statutory report, or a new affirmative finding by the Secretary under 19 U.S.C. § 1862(b)(3)(A).

66. The proclamation stated generally that the 25 percent tariff had not enabled the domestic steel and aluminum industries to develop and maintain the desired capacity-utilization rates. It did not make a Mexico-specific finding that a 50 percent tariff on Plaintiffs' steel was necessary to address the threat found in 2018.

67. Proclamation 10947 afforded affected importers less than one day to adjust before the doubled tariff took effect.

### F. PROCLAMATION 11021 FURTHER PERPETUATED THE TARIFF REGIME

68. On April 2, 2026, the President issued Proclamation 11021, which, among other things, applied Section 232 duties to covered steel articles and derivatives, applied such duties to the full customs value of certain covered products, and delegated additional derivative-inclusion authority.[13] As applied to Plaintiffs, Proclamation 11021 perpetuated the tariff regime established by Proclamations 10896 and 10947.

[13] Proclamation No. 11021, *Strengthening Actions Taken To Adjust Imports of Aluminum, Steel, and Copper Into the United States,* 91 Fed. Reg. 18,201 (published Apr. 9, 2026).

69. Proclamation 11021 again relied on the national-security threat identified in the 2018 Steel Report and on monitoring information and recommendations supplied outside a new Section 232(b) investigation and report.

### G. THE CHALLENGED MEASURES DIRECTLY INJURE EACH PLAINTIFF

70. The Challenged Measures (i.e., Proclamations 10896, 10947 and 11021) operate automatically at entry. CBP requires importers of covered merchandise to deposit the additional duties and assess those duties at liquidation.

71. Since March 12, 2025, Deacero USA has continued importing covered Mexican steel, albeit at substantially reduced volumes due to the additional costs imposed by the Challenged Measures. Through August 2026, it has paid or deposited approximately $[ ] in tariff duties pursuant to the Challenged Measures. These payments are ongoing and are legally required as a condition of importing covered merchandise subject to the Challenged Measures.

72. Those payments increase Deacero USA's landed cost, consume working capital, compress margins, and force the company either to absorb the tariff or raise prices and risk sales. Deacero USA has been unable to [ ].

73. The tariffs also impair the economic performance and expected return of the Dayton facility and other U.S. operations. They increase the cost of [ ]. Although initial production at the Dayton facility commenced in September 2025, [

].

74. The affected entries include both liquidated and unliquidated entries. Unless relief is granted, CBP will continue to liquidate entries with duties pursuant to the Challenged Measures and collect duties on future entries.

75. Deacero SAPI has long served U.S. customers through exports of steel products manufactured in its own steel mills in Mexico and through substantial investments in Deacero USA and INGETEK USA. Since March 2025, the Challenged Measures have substantially reduced Deacero SAPI's exports to the United States and impaired its ability to maintain customer relationships and market share in the U.S. market, resulting in lost sales opportunities, diminished competitiveness, reduced export revenues, and lower utilization of its production facilities.

76. INGETEK USA uses affected steel in its U.S. supply operations and has paid, and continues to pay, Section 232 duties on covered imports. Through August 2026, INGETEK USA has paid or deposited approximately $ [ ] in Section 232 duties pursuant to the Challenged Measures, and those payments continue as a condition of importing covered merchandise. Those duties impair INGETEK USA's profitability and adversely affect its ability to compete in the U.S. market.

77. The direct injuries suffered by Deacero USA and INGETEK USA, including increased costs, reduced sales, diminished market position, and impaired growth described above, have also reduced the profitability and value of those U.S. businesses. Those effects, in turn, have diminished the value and expected returns of Deacero SAPI's investments in Deacero USA and INGETEK USA.

78. These injuries are ongoing, concrete, and traceable to Defendants' collection of duties and enforcement of the Challenged Measures. A declaration and injunction preventing Defendants from applying the Challenged Measures to Plaintiffs, together with lawful liquidation or reliquidation and refunds, would redress those injuries.

## COUNT I

## ULTRA VIRES ACTION EXCEEDING THE AUTHORITY CONFERRED BY SECTION 232

79. Plaintiffs repeat and reallege the preceding paragraphs as though fully set forth herein.

80. Section 232 conditions presidential authority to adjust imports on an investigation and report by the Secretary of Commerce that identifies a threat to national security, followed by the determinations and actions specified in 19 U.S.C. § 1862(c).

81. The January 2018 Steel Report was the predicate for Proclamation 9705. It did not authorize an indefinite series of materially new tariff measures regardless of elapsed time, intervening findings, changed circumstances, or the statutory requirements for a current investigation and report.

82. By 2025, the 2018 Steel Report's application to Mexican steel had become substantively stale in light of intervening presidential determinations. In 2019, the President determined that Mexican steel would no longer threaten national security under the negotiated arrangement. In July 2024, the President adopted a new Mexico-specific regime and determined that it would be an effective, long-term alternative.

83. Proclamation 10896 did not merely implement a contingency within the original 2018 plan. It reversed the intervening Mexico-specific determinations, terminated a seven-month-old regime, and imposed a new across-the-board burden based on circumstances materially

removed from the 2018 investigation. In doing so, it abandoned the distinction adopted in Proclamation 10783 between North American melt-and-pour steel and steel incorporating third-country inputs, despite the President's prior determination that the 2024 framework would provide an effective, long-term alternative means of addressing the asserted national-security threat.

84. Monitoring information or undisclosed advice supplied by the Secretary cannot substitute for the investigation, process, report, and affirmative statutory finding required by 19 U.S.C. § 1862(b) when the predicate finding has become stale or the proposed action departs from it.

85. In *Transpacific Steel LLC v. United States*, the Federal Circuit upheld an adjustment made within a short period after the Secretary's report but expressly declined to address "other circumstances that would present other issues about presidential authority to adjust initially taken actions without securing a new report with a new threat finding from the Secretary." 4 F.4th 1306, 1311 (Fed. Cir. 2021). In *PrimeSource Building Products, Inc. v. United States*, the court likewise recognized that a different question may arise when the underlying finding or objective has become substantively stale. 59 F.4th 1255, 1262–63 (Fed. Cir. 2023).

86. In the present situation, nearly seven years elapsed, the Executive Branch twice found that Mexico-specific alternatives addressed the threat, and the 2025 measures imposed materially new burdens without a new statutory investigation or report.

87. Proclamation 10947 rests on and carries forward the invalid action in Proclamation 10896 and the same stale statutory predicate. To the extent the 50 percent rate is treated as a separate adjustment, it also exceeded delegated authority because no new Section 232(b) investigation and report satisfying § 1862(b)(3)(A) or valid current predicate tethered that escalation to the threat found in 2018.

88. To the extent Proclamation 11021 continues the collection of Section 232 duties on Plaintiffs' merchandise, it likewise exceeds the authority conferred by Section 232 because it perpetuates a tariff regime grounded in the same stale 2018 threat finding rather than a new statutory investigation and report.

89. The Challenged Measures therefore clearly misconstrue Section 232, violate significant statutory procedures, and exceed the authority Congress delegated. Their implementation against Plaintiffs is ultra vires and unlawful.

**COUNT II**

**FAILURE TO SATISFY 19 U.S.C. § 1862(c)(3)**

90. Plaintiffs repeat and reallege the preceding paragraphs as though fully set forth herein.

91. The 2019 arrangement with Mexico was an alternative means selected after negotiations to address the asserted national-security threat. Proclamation 9894 implemented that arrangement and removed Mexican steel from the tariff in exchange for monitoring, measures against transshipment, and the possibility of responding to future import surges. In July 2024, the United States modified that arrangement by imposing a North American "melt and pour" requirement.

92. Section 232(c)(3) (as amended, 19 U.S.C. § 1862(c)(3)) permits other action following a negotiated agreement only on the statutory predicate that the agreement is not being carried out or is ineffective in eliminating the national-security threat.

93. Proclamation 10896 contains generalized statements that multiple country arrangements had failed, but it does not make a legally sufficient Mexico-specific determination that the 2019 arrangement, as modified by the July 2024 melt-and-pour regime, was not being carried out or was ineffective within the meaning of Section 232(c)(3).

94. The proclamation does not explain why the Mexico-specific regime adopted seven months earlier was ineffective, identify material post-July-2024 experience showing failure, or connect the asserted surge in specific products to the termination of duty-free treatment for all covered Mexican steel. Nor does it explain why the distinction established by Proclamation 10783 between North American melt-and-pour steel and steel incorporating third-country inputs ceased to address the national-security concerns that the 2024 regime was specifically designed to remedy.

95. The proclamation also does not identify the USTR advice step contemplated by Proclamation 10783 for responding to a Mexican import surge.

96. Nor does the proclamation explain the departure from the 2019 arrangement's product-specific and sector-limited response to surges.

97. Proclamation 10896 did not find that Mexico had failed to carry out the arrangement, identify noncompliance with the recently adopted melt-and-pour requirements, or establish that the arrangement had become ineffective with respect to Mexican steel. Nor did it explain why the distinction established by Proclamation 10783 between North American melt-and-pour steel and steel incorporating third-country inputs no longer addressed the national-security concerns the arrangement was designed to remedy. The blanket reimposition of tariffs exceeded the authority Congress granted the Executive branch under Section 232.

98. Further, because the statutory predicate and procedure for replacing the Mexico arrangement were not lawfully satisfied, Proclamation 10896 and the implementation of the resulting tariffs against Plaintiffs exceed the authority conferred by Section 232(c)(3).

## COUNT III

## UNLAWFUL AGENCY IMPLEMENTATION

99. Plaintiffs repeat and reallege the preceding paragraphs as though fully set forth herein.

100. Commerce and CBP possess only the authority conferred by the statute. They may not implement, administer, or collect a tariff imposed beyond the authority delegated by Section 232.

101. To the extent any Commerce finding, report, recommendation, instruction, or other final agency action supplied the legal predicate for the Challenged Measures, that action did not satisfy the investigation, reporting, finding, timing, and procedural requirements of 19 U.S.C. § 1862(b)–(c).

102. To the extent CBP's final implementing instructions and actions apply duties from the Challenged Measures to Plaintiffs' merchandise, those actions depend on proclamations that exceed Section 232 and therefore are not in accordance with law, exceed statutory authority, and were taken without observance of procedure required by law. 5 U.S.C. § 706(2)(A), (C), (D).

103. To the extent Commerce's and CBP's final implementing instructions and actions apply duties pursuant to the Challenged Measures to Plaintiffs' merchandise, those actions constitute final agency action reviewable under the APA. Because those actions implement proclamations that exceed the authority granted by Section 232, they are not in accordance with law, exceed statutory authority, and were taken without observance of procedures required by law. They therefore must be held unlawful and set aside pursuant to 5 U.S.C. § 706(2)(A), (C), and (D).

104. Plaintiffs are entitled to an order setting aside or enjoining those implementing instructions as applied to them and directing CBP to liquidate or reliquidate affected entries without the unlawful duties, with refunds and interest as provided by law.

## COUNT IV

## SEPARATION OF POWERS AND NONDELEGATION

105. Plaintiffs repeat and reallege the preceding paragraphs as though fully set forth herein.

106. The Constitution vests in Congress "{a}ll legistlative Powers herein granted," U.S. Const. Art.I, § 1, including the powers to impose duties and regulate commerce with foreign nations, id. § 8, cls. 1, 3. The President has no inherent authority to impose tariffs during peacetime. *Learning Resources, Inc. v. Trump*, 607 U.S. 229, 241 (2026). Legislative power, including the power to impose tariffs and regulate foreign commerce, vests in Congress. U.S. Const. art. I, § 8.

107. The Supreme Court sustained Section 232 against a nondelegation challenge because the statute establishes "clear preconditions to Presidential action" and leaves presidential authority "far from unbounded." *Federal Energy Administration v. Algonquin SNG, Inc*., 426 U.S. 548, 559–60 (1976). Those preconditions include a Commerce investigation and report finding that imports of a particular article threaten to impair national security.

108. If, contrary to Plaintiffs' statutory claims in Counts I and II, Section 232 is construed to authorize materially new and repeatedly escalating tariffs seven or more years after the predicate investigation and report, after intervening agreements and Mexico-specific measures, and without a new investigation and report addressing changed circumstances, that construction would sever the Challenged Measures from the statutory preconditions that bounded the delegation sustained in *Algonquin*.

109. The Federal Circuit has recognized that "a different question might be presented where the underlying finding or objective has become substantively stale." *PrimeSource Building Products, Inc. v. United States,* 59 F.4th 1255, 1264 (Fed. Cir. 2023). The seven-year interval and intervening Mexico-specific arrangements alleged here present the type of different question that *PrimeSource* left open.

110. Under Defendants' apparent construction, a single historical threat finding could serve indefinitely as authority to reimpose, expand, and repeatedly increase tariffs despite materially changed circumstances. The investigation, report, threat-finding, and timing requirements in 19 U.S.C. § 1862(b)–(c) would constrain only the initial action and would have no practical force as to materially new later actions.

111. If Section 232 authorizes that result, it confers effectively unbounded tariff authority without an intelligible principle or enforceable limitation tying materially new tariff actions to the national-security threat identified through the statutory process, in violation of Article I and the separation of powers.

112. Plaintiffs plead this claim in the alternative. If the Court rejects the statutory construction advanced in Counts I and II and accepts Defendants' broader construction of Section 232, Plaintiffs preserve their contention that Section 232, as so construed and applied, violates the Constitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and:

A. Declare that Proclamation 10896 exceeds the authority conferred by Section 232 and is unlawful as applied to Plaintiffs and their covered Mexican steel;

B. Declare that Proclamation 10947 exceeds the authority conferred by Section 232 and is unlawful as applied to Plaintiffs and their covered Mexican steel;

C. Declare that Proclamation 11021 exceeds the authority conferred by Section 232 and is unlawful as applied to Plaintiffs;

D. Declare unlawful and set aside, or enjoin, Commerce and CBP actions implementing and enforcing the Challenged Measures against Plaintiffs;

E. Permanently enjoin Defendants, their officers, employees, and agents from assessing, collecting, or enforcing Section 232 duties from the Challenged Measures against Plaintiffs' covered merchandise;

F. Pending final resolution of this action, including any appeals, order CBP to suspend Plaintiffs' unliquidated entries subject to the Challenged Measures, as necessary to preserve Plaintiffs' and the Court's ability to provide complete and meaningful relief if Plaintiffs prevail;

G. Direct CBP, for all entries within the Court's remedial authority – including unliquidated entries and entries eligible for reliquidation – to liquidate or reliquidate without the duties subject to the Challenged Measures and refund duties paid or deposited by each individual Plaintiff, with interest as provided by law;

H. Award Plaintiffs their costs and, to the extent authorized by law, reasonable attorneys' fees; and

I. Grant such other and further relief as the Court deems just and proper.

Respectfully Submitted,

/s/ Mark R. Ludwikowski

Mark Ludwikowski
Robert Kevin Williams
Kelsey Christensen
Ashley Gifford
**CLARK HILL PLC**
Attorneys for Plaintiffs
601 13th Street, N.W.
Suite 600 South
Washington, DC 20005
(202) 640-6680
mludwikowski@ClarkHill.com

Dated: September 11, 2026