IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE LISA W. WANG, JUDGE

| | |
|---|---|
| DEACERO S.A.P.I., DEACERO USA, INC., and INGETEK USA, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES, U.S. DEPARTMENT OF COMMERCE, HOWARD W. LUTNICK, in his official capacity as Secretary of Commerce, U.S. CUSTOMS AND BORDER PROTECTION, and RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection,<br><br>Defendants. | Court No. 26-3951 |

ORDER

On consideration of defendants' motion to dismiss the complaint, plaintiffs' response, and all other papers, it is hereby

ORDERED that the defendants' motion is granted and, it is further

ORDERED that the complaint is dismissed.

Dated: ______________, 2026
New York, New York

_______________________________
JUDGE LISA W. WANG

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE LISA W. WANG, JUDGE

| | |
|---|---|
| DEACERO S.A.P.I., DEACERO USA, INC., and INGETEK USA, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES, U.S. DEPARTMENT OF COMMERCE, HOWARD W. LUTNICK, in his official capacity as Secretary of Commerce, U.S. CUSTOMS AND BORDER PROTECTION, and RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection,<br><br>Defendants. | Ct. No. 26-3951 |

DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

JONATHAN D. GUYNN
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel.: (202) 616-2228
Email: tara.hogan@usdoj.gov

Attorneys for Defendants

OF COUNSEL:

B. KATHRYN DEBRASON
RACHEL MORRIS
Attorney Advisors
Office of the Chief Counsel for
Industry & Security
Department of Commerce

November 24, 2026

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

QUESTIONS PRESENTED ........ 2

STATEMENT OF FACTS ........ 3

I. Section 232 Authorizes the President to Adjust Imports of Articles and Their Derivatives ........ 3

II. Commerce's Investigation into the Effect of Imports of Steel Articles on Our National Security and Recommendations to the President ........ 4

III. To Address the Threatened Impairment to National Security, the President Adjusted Imports of Steel ........ 6

IV. The President Makes Further Adjustments to the Initial Measures Set Forth in Proclamation 9705 ........ 8

V. The Challenged Measures: Proclamations 10896, 10947, and 11021 ........ 10

VI. Deacero's Suit ........ 12

SUMMARY OF ARGUMENT ........ 12

ARGUMENT ........ 13

I. Standard of Review ........ 13

II. The Challenged Measures Complied with Section 232's Procedural Requirements ........ 14

A. There Is No Genuine Concern About Staleness ........ 15

B. Any Challenge to the President's Duration Determination is not Reviewable ........ 21

III. The President Complied With 19 U.S.C. § 1862(c)(3) ........ 23

IV. The Complaint Fails to State a Claim Against Any Action by Commerce Or CBP ........ 27

V. In Light of *Algonquin* and *PrimeSource*, Deacero's Non-Delegation Claim Must Be Dismissed ........ 28

CONCLUSION ........ 30

ADDENDUM

## TABLE OF AUTHORITIES

Cases

*Acceptance Ins. Cos., Inc. v. United States*,
583 F.3d 849 (Fed. Cir. 2009) ........ 13

*Am. Inst. for Int'l Steel, Inc. v. United States*,
806 F. App'x 982 (Fed. Cir. 2020) ........ 30

*Axle of Dearborn, Inc. v. Dep't of Com.*,
No. 25-00091, 2026 Ct. Int'l Trade LEXIS 117 (Aug. 13, 2026) ........ 27

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 13, 14

*Browning v. Clinton*,
292 F.3d 235 (D.C. Cir. 2002) ........ 13

*Dalton v. Specter*,
511 U.S. 462 (1994) ........ 22

*FCC v. Consumers' Research*,
606 U.S. 656 (2025) ........ 28

*Fed. Energy Admin. v. Algonquin SNG, Inc.*,
426 U.S. 548 (1976) ........ 2, 13, 28, 29

*Florsheim Shoe Co. v. United States*,
744 F.2d 787 (Fed. Cir. 1984) ........ 14

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ........ 25, 27

*Kam-Almaz v. United States*,
682 F.3d 1364 (Fed. Cir. 2012) ........ 13

*Kellogg Brown & Root Servs., Inc. v. United States*,
728 F.3d 1348 (Fed. Cir. 2013) ........ 14

*Learning Resources, Inc. v. Trump*,
607 U.S. 229 (2026) ........ 29

*Mallory v. Norfolk S. Ry. Co.*,
600 U.S. 122 (2023) ........ 29

*Maple Leaf Fish Co. v. United States*,
762 F.2d 86 (Fed. Cir. 1985) ........ 14

*Neitzke v. Williams*,
490 U.S. 319 (1989) ........ 13

*PrimeSource Bldg. Prods. v. United States*,
59 F.4th 1255 (Fed. Cir. 2023) ........ 2, 13, 14, 16, 17, 19, 22, 25, 27, 30

*Secured Mail Sols., LLC v. Universal Wilde, Inc.*,
873 F.3d 905 (Fed. Cir. 2017) ........ 14

*Silfab Solar, Inc. v. United States*,
892 F.3d 1340 (Fed. Cir. 2018) ........ 21, 26

*Transpacific Steel LLC v. United States*,
4 F.4th 1306 (Fed. Cir. 2021) ........ 2, 13, 15, 17, 18, 19, 20, 22, 26

*Trump v. Hawaii*,
585 U.S. 667 (2018) ........ 25

*USP Holdings, Inc. v. United States*,
36 F.4th 1359 (Fed. Cir. 2022) ........ 21, 25, 30

*Webster v. Doe*,
486 U.S. 592 (1988) ........ 25

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001) ........ 30

*Zemel v. Rusk*,
381 U.S. 1 (1965) ........ 30

Statutes

19 U.S.C. § 1862 ........ passim

Rules

United States Court of International Trade Rule 12(b)(6) ........ 1

Presidential Proclamations

*Proclamation 3279, Adjusting Imports of Petroleum and Petroleum Products into the United States*, 24 Fed. Reg. 1781 (Mar. 12, 1959) ........ 20

*Proclamation 4210, Modifying Proclamation 3279 Relating to Imports of Petroleum and Petroleum Products Through a System of License Fees and Providing for Gradual Reduction of Levels of Imports of Crude Oil, Unfinished Oils and Finished* Products, 38 Fed. Reg. 9,645 (Apr. 19, 1973) ..................... 20

*Proclamation 9705 of March 8, 2018, Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11625 (Mar. 15, 2018) ..................... 6, 18

*Proclamation 9711 of March 22, 2018, Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 13361 (Mar. 28, 2018) ..................... 8

*Proclamation 9759 of May 31, 2018*, *Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 25857 (June 5, 2018) ..................... 8

*Proclamation 9894 of May 19, 2019, Adjusting Imports of Steel Into the United States*, 84 Fed. Reg. 23987 (May 23, 2019) ..................... 8, 9, 24

*Proclamation 9980 of January 24, 2020, Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles into the United States*, 85 Fed. Reg. 5281 (Jan. 29, 2020) .......... 9

*Proclamation 10783 of July 10, 2024, Adjusting Imports of Steel into the United States*, 89 Fed. Reg. 57347 (July 15, 2024) ..................... 9

*Proclamation 10896 of February 10, 2025, Adjusting Imports of Steel Into the United* States, 90 Fed. Reg. 9817 (Feb. 18, 2025) ..................... 11, 17, 18, 23, 24, 27

*Proclamation 10947 of June 3, 2025, Adjusting Imports of Aluminum and Steel Into the United States*, 90 Fed. Reg. 24199 (June 9, 2025) ..................... 11, 18, 19

*Proclamation 11021 of April 2, 2026, Strengthening Actions Taken To Adjust Imports of Aluminum, Steel, and Copper Into the United States*, 91 Fed. Reg. 18201 (Apr. 9, 2026) ..................... 12, 18, 19

<u>Other Authorities</u>

*Publication of a Report on the Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, 85 Fed. Reg. 40202 (Dep't of Com. July 6, 2020) ..................... 4, 5

United States Tariff Commission, WORLD OIL DEVELOPMENTS AND U.S. OIL IMPORT POLICIES, T.C. Publication 632 at 44 (1973), *available at usitc.gov/publications/other/pub632.pdf* ........... 20

U.S. Customs and Border Protection, Cargo Systems Messaging Service # 62582900, "*GUIDANCE: Section 232 Melt and Pour Requirements*," Oct. 9, 2024, 09:40 AM EDT, *available at https://content.govdelivery.com/accounts/USDHSCBP/bulletins/3baf074*. ..................... 10

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE LISA W. WANG, JUDGE

| | |
|---|---|
| DEACERO S.A.P.I., DEACERO USA, INC., and INGETEK USA, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES, U.S. DEPARTMENT OF COMMERCE, HOWARD W. LUTNICK, in his official capacity as Secretary of Commerce, U.S. CUSTOMS AND BORDER PROTECTION, and RODNEY S. SCOTT, in his official capacity as Commissioner of U.S. Customs and Border Protection,<br><br>Defendants. | Ct. No. 26-3951 |

DEFENDANTS' MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

Pursuant to United States Court of International Trade Rule 12(b)(6), defendants respectfully move to dismiss the complaint of plaintiffs Deacero S.A.P.I de C.V., Deacero USA, Inc., and INGETEK USA, LLC (collectively, Deacero), for failure to state a claim upon which relief may be granted.

Deacero seeks relief that the United States Court of Appeals for the Federal Circuit has consistently denied: a declaration that action taken by the President, in furtherance of objectives set forth in initial action and findings taken pursuant to Section 232 of the Trade Expansion Act of 1962, as amended, is unlawful. Specifically, Deacero asks this Court to declare that Presidential Proclamations 10896, 10947, and 11021, adjusting tariffs applicable to imports of Mexican steel, exceeded the President's Section 232 authority because the actions are

purportedly too far removed from the Secretary of Commerce's (Secretary) 2018 steel import investigation and report.

As we demonstrate below, the challenged proclamations are lawful. The President's actions here are entirely consistent with Section 232's text. The President followed all statutory predicates for the import adjustments made in those proclamations. And the actions challenged here are materially identical to prior presidential action that the Federal Circuit held to be part of a lawful continuing course of action in furtherance of the objectives set forth in the original threat finding and action by the President. *See Transpacific Steel LLC v. United States*, 4 F.4th 1306 (Fed. Cir. 2021); *PrimeSource Bldg. Prods. v. United States*, 59 F.4th 1255 (Fed. Cir. 2023). Finally, as the Supreme Court and the Federal Circuit have held, Section 232 easily satisfies the nondelegation doctrine. *See Fed. Energy Admin. v. Algonquin SNG, Inc.*, 426 U.S. 548, 559 (1976); *PrimeSource*, 59 F.4th at 1263; *Transpacific Steel*, 4 F.4th at 1322-33. The complaint must be dismissed.

## QUESTIONS PRESENTED

1. Whether Presidential Proclamations 10896, 10947, and 11021 are *ultra vires* because they were made in furtherance of a course of action that is derived from a Section 232 investigation and resulting report from the Secretary of Commerce that was submitted to the President in 2018.

2. Whether, in issuing Presidential Proclamations 10896, 10947, and 11021, the President complied with all procedural requirements of 19 U.S.C. § 1862(c)(3).

3. Whether Deacero's challenges to the Secretary's advice and U.S. Customs and Border Protection's (CBP) implementing instructions are judicially reviewable.

4. Whether Section 232 is a constitutional delegation of legislative authority to the Executive Branch.

## STATEMENT OF FACTS

### I. Section 232 Authorizes the President to Adjust Imports of Articles and Their Derivatives

Section 232 of the Trade Expansion Act of 1962 empowers the President, after certain preconditions are met, to take action to "adjust the imports" of articles and their derivatives so that such imports will not threaten to impair the national security of the United States. 19 U.S.C. § 1862(c)(1)(A)(ii).[1] Specifically, if the President receives, and concurs with, a finding by the Secretary of Commerce that imports of an article threaten to impair the national security of the United States, the President is authorized to take action that the President, in his judgment, will address the national-security threat.

The Secretary of Commerce is authorized to conduct an investigation "to determine the effects on the national security of {an} article," *id.* § 1862(b)(1)(A), and is directed to consult with specific officials. The statute directs the Secretary to submit a report with findings to the President within 270 days of investigation of any article and offer "recommendations . . . for action or inaction." *Id.* § 1862(b)(3)(A).

If the Secretary finds that an article is being imported in such quantities or under such circumstances as to threaten to impair the national security, the President is directed to determine, within 90 days after receiving the report, whether he concurs with the Secretary's finding. *Id.* § 1862(c)(1)(A)(i). If so, the President is authorized to determine the "nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports

[1] The full text of the statute is reproduced in the addendum to this motion.

of the article and its derivatives so that such imports will not threaten to impair the national security." *Id*. § 1862(c)(1)(A). If the President determines to take action, the statute instructs the President to take initial action within 15 days following that determination. *Id*. § 1862(c)(1)(B).

Section 232(d) identifies a non-exclusive list of factors to guide the Secretary and the President. These factors include the "domestic production needed for projected national defense requirements;" "the capacity of domestic industries to meet such {national defense} requirements." and "the requirements of growth of such industries and such supplies and services including the investment, exploration, and development necessary to assure such growth." *Id.* § 1862(d). Section 232(d) further directs the Secretary and the President to recognize "the close relation of the economic welfare of the Nation to our national security." *Id.*

## II. Commerce's Investigation into the Effect of Imports of Steel Articles on Our National Security and Recommendations to the President

On April 19, 2017, the Secretary of Commerce initiated a Section 232 investigation to determine the effect of steel imports on national security. *See generally Publication of a Report on the Effect of Imports of Steel on the National Security: An Investigation Conducted Under Section 232 of the Trade Expansion Act of 1962, as Amended*, 85 Fed. Reg. 40202 (Dep't of Com. July 6, 2020). The same day, the Secretary notified the Secretary of Defense, as required by 19 U.S.C. § 1862(b). *Id*. at 40208. Consistent with 19 U.S.C. § 1862(b)(3)(A), the Secretary submitted the report and recommendation to the President on January 11, 2018, within 270 days of initiation of the investigation. *Id.*

In the report, the Secretary found that the availability of steel manufactured by a healthy domestic industry is important to national defense, among other findings. *Id*. at 40209. The Secretary also determined that steel "imports in such quantities as are presently found adversely impact the economic welfare of the U.S. steel industry." *Id*. at 40210. In reaching this finding,

the Secretary concluded that, "{i}n the steel sector, foreign competition is characterized by substantial and sustained global overcapacity and production in excess of foreign domestic demand." *Id.*

The Secretary further found that displacement of domestic steel by excessive quantities of imports has the serious effect of weakening our internal economy. *Id.* at 40218. The Secretary found that domestic steel production capacity is "stagnant and concentrated" and that capacity for production in integrated facilities has fallen precipitously over the last two decades. *Id.* As a result, the Secretary found "a further reduction in basic oxygen furnace capacity, which is especially important to the ability of domestic industry to meet national security needs, is inevitable if the present imports continue or increase." *Id.* at 40219. The Secretary determined that this displacement of domestic production would place the United States in a position where it may be unable to meet demands for national defense and critical industries in a national emergency. *Id.* The Secretary further found that the internal economy was weakened because domestic production is far below demand, whereas domestic utilization rates are well below a sustainable level. *Id.* Given the domestic industry's contraction, the Secretary found that, "{i}f the U.S. requires a similar increase in steel production as it did during previous national emergencies, domestic steel production capacity may be insufficient to satisfy national security needs." *Id.* at 40222.

The Secretary further found that global excess steel capacity is weakening the domestic economy. *Id.* at 40223. The Secretary explained that there is "substantial chronic global excess steel production led by China," and that several other countries also continue to add production capacity. *Id.*

In light of these findings, the Secretary determined that steel articles are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States. To address that national-security threat, "the Secretary recommend{ed} that the President take immediate action by adjusting the level of imports through quotas or tariffs on steel imported into the United States" so as to "keep the U.S. steel industry financially viable and able to meet U.S. national security needs." *Id*. at 40225. The Secretary further recommended two alternative approaches, each expected to increase the domestic industry's capacity utilization rate to 80 percent. *Id*. at 40225-26.

The Secretary proposed that any final proclamation should allow the President to exempt certain countries from any measures based on overriding economic or security interests but that if a country is exempted, corresponding adjustments to the tariff or quotas involving unexempted countries should be considered, to ensure that the overall imports of steel were sufficiently adjusted to achieve a sustainable capacity utilization. *Id.*

## III. To Address the Threatened Impairment to National Security, the President Adjusted Imports of Steel

After considering the Secretary's report and recommendations, the President issued a proclamation concurring with the Secretary's threat finding and announcing a plan of action, which included measures "adjusting imports of steel into the United States" to address the threat to the national security of the United States. Proclamation 9705 of March 8, 2018*, Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 11625 (Mar. 15, 2018). More specifically, the President established a tariff regime on imports of steel articles, effective March 23, 2018, which included a 25 percent tariff on certain imports of steel articles. *Id.*, cls. (1)–(2).

The President acknowledged the Secretary's findings that the present quantities of steel imports and the circumstances of global excess capacity are "weakening our internal economy,"

resulting in the persistent threat of further closures of domestic steel production facilities and the "shrinking {of our} ability to meet national security production requirements in a national emergency." *Id.* ¶ 2. The President further noted the Secretary's conclusion that, because of these risks and the findings that the United States may be unable to "meet {steel} demands for national defense and critical industries in a national emergency," the present quantities and circumstances of steel imports threaten to impair the national security. *Id.* The President "concur{red} in the Secretary's finding that steel articles are being imported into the United States in such quantities and under such circumstances as to threaten to impair the national security of the United States." *Id.* ¶ 5.

The President considered the Secretary's recommendations regarding the adjustment of steel imports. *Id.* In selecting a tariff as the appropriate measure, the President recognized that the United States "has important security relationships with some countries whose exports of steel articles to the United States weaken our internal economy and thereby threaten to impair the national security," and that there is a "shared concern about global excess capacity, a circumstance that is contributing to the threatened impairment of the national security." *Id.* ¶ 9. The President proclaimed that "any country with which" the United States has "a security relationship" could discuss alternative ways to address the threatened impairment of our national security caused by imports from that country. *Id.* The President left open the option to "remove or modify" restrictions on imports "{s}hould the United States and any such country arrive at a satisfactory alternative means to address the threat to the national security." *Id.*

The President also directed the Secretary to monitor imports of steel articles and to inform him of any circumstances "that in the Secretary's opinion might indicate the need for further action" or "indicate that the increase in duty rate provided for in this proclamation is no

longer necessary." *Id.*, cl. 5(b). In doing so, the President recognized that the measures set forth in the proclamation were "an important first step in ensuring the economic viability of our domestic steel industry." *Id.* cl. 11.

IV. The President Makes Further Adjustments to the Initial Measures Set Forth in Proclamation 9705

Since announcing the plan of action in Proclamation 9705, the President has, on numerous occasions, modified the measures to ensure that the tariff regime is calibrated to achieve the objectives stated in Proclamation 9705 and to eliminate the threat of impairment to the national security of the United States. The President has done so based on new information provided by subordinates, including the Secretary of Commerce. The actions relevant to this case are described below.

***Negotiations***. The United States engaged in discussions with several countries to obtain appropriate assurances concerning steel exports to the United States. The President deferred imposition of measures on imports from several jurisdictions, including Mexico, as part of an effort to reach agreements that would address the threat to national security posed by steel article imports from those countries. *Proclamation 9711 of March 22, 2018, Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 13361 ¶¶ 6–9 (Mar. 28, 2018).

The President extended the temporary exemption for products from Mexico, among other jurisdictions, until June 1, 2018. Proclamation 9759 of May 31, 2018, *Adjusting Imports of Steel Into the United States*, 83 Fed. Reg. 25857 (June 5, 2018). When no satisfactory agreement was reached by that date, the tariff took effect with respect to imports from Mexico until May 23, 2019, on which date, in Proclamation 9894, the President reported the exclusion of imports from Mexico from tariffs based upon successful negotiations with that country. Proclamation 9894 of May 19, 2019, *Adjusting Imports of Steel Into the United States*, 84 Fed. Reg. 23987 (May 23,

2019). The President announced an agreement "on a range of measures with Canada and Mexico to prevent the importation of steel articles that are unfairly subsidized or sold at dumped prices, to prevent the transshipment of steel articles, and to monitor for and avoid import surges." *Id.* ¶ 5. Consequently, the President determined to exclude imports from Mexico from the Section 232 measures. *Id.* at 23988, ¶ 6. The President stated that "{t}he United States will monitor the implementation and effectiveness of these measures in addressing our national security needs, and [that the President] may revisit this determination as appropriate." *Id.*[2]

***Melt and Pour Requirement with Future Monitoring.*** Six years later, in Proclamation 10783, the President instituted a melt and pour requirement for steel imports from Mexico in response to information suggesting imports from Mexico could be undermining the effectiveness of the Section 232 steel tariff regime in addressing the threat to national security posed by imports of steel. Proclamation 10783 of July 10, 2024*, Adjusting Imports of Steel into the United States*, 89 Fed. Reg. 57347 (July 15, 2024). The President reported that the "Secretary has informed me that domestic steel producers' capacity utilization remains below the target 80 percent capacity utilization recommended in the Secretary's report of January 11, 2018, and imports of steel articles from Mexico have increased significantly as compared to their levels at the time of Proclamation 9894." *Id.* at 57348, ¶ 8. The President determined that it was "appropriate to revisit" the prior determination removing the tariff from steel articles imports from Mexico. *Id.* ¶ 8. This proclamation instituted a "melt and pour requirement for imports of

---

[2] In Proclamation 9980, the President extended these import measures to derivatives of steel articles. Proclamation 9980 of January 24, 2020*, Adjusting Imports of Derivative Aluminum Articles and Derivative Steel Articles into the United States*, 85 Fed. Reg. 5281 (Jan. 29, 2020).

steel articles that are products of Mexico" as an additional requirement for Mexican-origin steel imports to be eligible for entry into the United States without Section 232 duties.[3] *Id.* ¶ 9.

This proclamation also expressly contemplated that future action may be necessary to ensure the effectiveness of Section 232 steel tariffs. The President directed the United States Trade Representative, in consultation with the Secretary, to advise "if there is a surge in imports of steel articles to the United States from Mexico and on the appropriate means to ensure that such imports from Mexico do not undermine the national security objectives of the tariff imposed in Proclamation 9705, as amended." *Id.* at 57348, ¶ 10. The President specifically left open, as a potential course of action, "directing" CBP "to no longer exclude imports of steel articles from Mexico from the tariff imposed in Proclamation 9705, as amended." *Id.*

V. <u>The Challenged Measures: Proclamations 10896, 10947, and 11021</u>

To ensure that the steel tariff regime effectively address the threat to the national security, the President continued to modify the steel tariff regime following subsequent monitoring of imports and updates from subordinates based on non-stale information. In particular, after considering the newly provided information, the President found that the measures and alternative agreements had not proven sufficiently effective in meeting and sustaining the capacity utilization objective established in Proclamation 9705. Therefore, the President issued further proclamations to address the threat of impairment to the national security caused by imports of steel articles, including those from Mexico.

---

[3] "Country of melt and pour refers to the original location where the raw steel is first produced in a steel-making furnace in a liquid state and then poured into its first solid shape," while "{t}he location of melt and pour is customarily identified on mill test certificates generated at each stage of the production process and maintained in the ordinary course of business." *See* U.S. Customs and Border Protection, Cargo Systems Messaging Service # 62582900, "*GUIDANCE: Section 232 Melt and Pour Requirements*," Oct. 9, 2024, 09:40 AM EDT, *available at https://content.govdelivery.com/accounts/USDHSCBP/bulletins/3baf074*.

In Proclamation 10896, the President terminated all Section 232 duty country exemptions, including for Mexico. Proclamation 10896 of February 10, 2025, *Adjusting Imports of Steel Into the United* States, 90 Fed. Reg. 9817 (Feb. 18, 2025). In so doing, the President referred back to Proclamation 9705, which "directed the Secretary to monitor imports of steel articles" and "inform" the President "of any circumstances that in the Secretary's opinion might indicate the need for further action under Section 232, as amended, with respect to such imports." *Id.* ¶ 3. The President explained that "{a}s steel import market share has increased, the domestic industry's performance has been depressed, resulting in capacity utilization rates persistently lower than the 80 percent target level highlighted in the Secretary's report." *Id.* ¶ 6. "In {the President's} judgment, the arrangements with these countries have failed to provide effective, long-term alternative means to address these countries' contribution to the threatened impairment to the national security by restraining steel articles exports to the United States from each of them, limiting transshipment and surges and distorted pricing, and discouraging excess steel capacity and excess steel production." *Id.* at 9820, ¶ 14. Accordingly, to more effectively address the national-security threat posed by imports of steel, the President reinstated the 25 percent tariff on imports of steel article and derivatives from Mexico. *Id.*

Four months later, the President further adjusted the duties on steel imports, including from Mexico, in Proclamation 10947. *Proclamation 10947 of June 3, 2025, Adjusting Imports of Aluminum and Steel Into the United States*, 90 Fed. Reg. 24199 (June 9, 2025). "After considering current information newly provided by the Secretary," the President determined "that it is necessary to increase" the duties previously provided for in Proclamation 10896 to 50 percent *ad valorem*. *Id.* at 24200, ¶¶ 6–7. Among other things, the President explained that the

increased duty rate would "more effectively counter foreign countries that continued to offload low priced, excess steel . . . in the United States markets." *Id.* ¶ 6.

Finally, earlier this year, the President issued Proclamation 11021 to establish the application of the Section 232 tariff to the full customs value of the article, regardless of metal content.[4] Proclamation 11021 of April 2, 2026, *Strengthening Actions Taken To Adjust Imports of Aluminum, Steel, and Copper Into the United States*, 91 Fed. Reg. 18201, 18202 ¶ 8 (Apr. 9, 2026).

VI. Deacero's Suit

Deacero is a producer and exporter of steel articles from Mexico. Compl. ¶¶ 18–22. The steel articles it produces are subject to Section 232 tariffs. Compl. ¶¶ 20, 23, 28. Deacero alleges that it "manufactures steel in its Mexican mills using a North American melt-and-pour production chain." Compl. ¶ 29. Deacero alleges that it has been injured as a result of the reimposition of duties on steel articles from Mexico. Compl. ¶¶ 75–78.

## SUMMARY OF ARGUMENT

Deacero's challenge to the President's Section 232 action should be dismissed for failure to state a claim. Deacero's primary challenge rests on language in two decisions by the Federal Circuit, which Deacero interprets as suggesting that not all action taken after Section 232's predicate actions would be lawful. But Deacero's reading of *Transpacific Steel* and *PrimeSource* cannot be reconciled with either their holdings or the text of Section 232. In these cases, the Federal Circuit found that Section 232 does not provide any duration, expiration, or timing

[4] Previously, the Section 232 steel tariffs generally applied to the full value of specific derivative products in Chapter 73 of the Harmonized Tariff Schedule of the United States (HTSUS). Other derivative products were generally subject to tariffs only based on the steel content of the article. Proclamation 10896*,* 90 Fed. Reg. 9817.

requirement on the President's ability to adjust import measures over time. The Federal Circuit has also squarely rejected the arguments advanced by Deacero that the Section 232 steel report has somehow become "stale" where, as here, the President relies upon updated information to take action in furtherance of the original findings and objectives.

The remainder of Deacero's arguments fare no better. This Court cannot review Commerce's monitoring activities or CBP's implementation actions because the challenged actions were taken by the President and therefore there is no agency action for judicial review. And Deacero's alternative non-delegation challenge is foreclosed by Supreme Court precedent, which held that Section 232 "easily fulfills {the intelligible principle}" test, *Algonquin*, 426 U.S. at 559, and by more recent Federal Circuit precedent reaffirming that Section 232 does not violate the nondelegation doctrine, *see PrimeSource*, 59 F.4th at 1263; *Transpacific Steel*, 4 F.4th at 1332-33.

## ARGUMENT

### I. Standard of Review

"Rule 12(b)(6) authorizes a court to dismiss a claim on the basis of a dispositive issue of law." *Neitzke v. Williams*, 490 U.S. 319, 326 (1989). The Court must dismiss a complaint that does not "allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." *Kam-Almaz v. United States*, 682 F.3d 1364, 1367 (Fed. Cir. 2012) (quoting *Acceptance Ins. Cos., Inc. v. United States*, 583 F.3d 849, 853 (Fed. Cir. 2009)). A Rule 12(b)(6) motion to dismiss "tests the legal sufficiency of a complaint," *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002), which must be dismissed if it fails to present a "legally cognizable right of action," *Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

"In deciding a motion to dismiss, the court must accept well-pleaded factual allegations as true and must draw all reasonable inferences in favor of the claimant," *Kellogg Brown & Root Servs., Inc. v. United States*, 728 F.3d 1348, 1365 (Fed. Cir. 2013), but need not accept legal conclusions contained in the same allegations, *Twombly*, 550 U.S. at 555. Nor is this Court bound to "accept as true allegations that contradict matters properly subject to judicial notice or by exhibit" in ruling on a 12(b)(6) motion. *Secured Mail Sols., LLC v. Universal Wilde, Inc.*, 873 F.3d 905, 913 (Fed. Cir. 2017) (citation omitted).

The Court's review of the actions of the President pursuant to a statute is limited. *PrimeSource*, 59 F.4th at 1260. "For a court to interpose, there has to be a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *Id.* (citing *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985)). "The President's findings of fact and the motivations for his action are not subject to review." *Florsheim Shoe Co. v. United States*, 744 F.2d 787, 795 (Fed. Cir. 1984) (citations omitted).

## II. The Challenged Measures Complied with Section 232's Procedural Requirements

Deacero first alleges that the President could not rely upon the Secretary's 2018 investigation and report as a predicate for the three challenged proclamations because the 2018 report had become "substantively stale in light of intervening presidential determinations." Compl. ¶¶ 82, 84. Deacero alleges that the measures therefore "misconstrue Section 232" and "violate significant statutory procedures." Compl. ¶ 89. Deacero does not allege facts to support its theory of staleness, instead gesturing to cases that leave open the possibility that a Section 232 report *could* become stale at some point. But *Transpacific Steel* and *PrimeSource* compel the opposite conclusion and prove fatal to Deacero's position.

The challenged proclamations were issued in furtherance of the same objectives underlying the 2018 steel report that the Federal Circuit found *not* stale, and the President acted based on updated information provided by subordinates based on their monitoring of relevant circumstances, including the quantity of steel imports, the circumstances under which steel is imported, and the strength of the domestic industry. The President has sought to accomplish the same objectives in a series of actions over the course of years, actions that the Federal Circuit has also upheld. Each action has been informed by ongoing monitoring of the effectiveness of the then-applicable measures in furtherance of the 2018 report's stated objectives. The "intervening presidential determinations" that Deacero invokes also sought to further, rather than depart from, the objectives of the 2018 report. Accordingly, Proclamations 10896, 10947, and 11021 are lawful actions taken within the President's Section 232 authority. In any event, the duration of the President's action is a decision committed to the President and thus unreviewable.

A. There Is No Genuine Concern About Staleness

First, there is no genuine concern about staleness here. *Transpacific Steel* and *PrimeSource* establish as much.

In *Transpacific Steel*, the Federal Circuit held that the President need not obtain a new investigation and report from the Secretary before taking action to adjust imports of steel after the 15-day period for initial action set forth in 19 U.S.C. § 1862(c)(1). After carefully examining the statute's history, structure, and purpose, the court held that the authority delegated in Section 232 "permits the President to announce a continuing course of action within" the 15-day period set forth in § 1862(c)(1) "and then modify the initial implementing steps in line with the announced plan of action by adding impositions on imports to achieve the stated implementation objective." *Transpacific*, 4 F.4th at 1318-19. The court concluded that the President's action,

which increased the duty rate on steel from Türkiye five months after the issuance of Proclamation 9705, was a lawful exercise of Section 232 authority. *Id*. at 1310.

Deacero emphasizes a portion of the opinion suggesting that not every conceivable presidential imposition after the 15-day period would be necessarily lawful. *Id.* at 1323. The court gave as an example "an imposition that makes no sense except on premises that depart from the Secretary's finding, whether because the finding is simply too stale to be a basis for the new imposition or for other reasons." *Id*. Critically, however, with respect to the proclamation challenged in *Transpacific*, premised on the same 2018 investigation and report at issue here, the Federal Circuit observed "no genuine concern about" the "staleness" of the original threat finding and objectives. *Id*. at 1332. In reaching that conclusion, the court observed that the proclamation at issue came only months after Proclamation 9705, that Proclamation 9705 expressly provided for the possibility of future changes to the Section 232 measures, and that the action sought to achieve the same capacity utilization objective. *Id*.

Two years later, the Federal Circuit again addressed Section 232 in a challenge to a proclamation that extended the coverage of Section 232 duties to imports of steel derivatives, such as nails and fasteners. *PrimeSource*, 59 F.4th at 1257. Again, the court rejected challenges to presidential action taken after the 15-day period for initial action expired. *Id*. The court concluded that the two-year gap between issuance of Proclamation 9705 and the challenged action was not a basis to distinguish or disregard the holding in *Transpacific* that Section 232 authorized the President to take a continuing course of action.

Though the court noted that "a different question might be presented where the underlying finding or objective has become substantively stale," it again found no "genuine concern about staleness" concerning the 2018 steel report and no basis to "overrid{e} the

President's judgment." *PrimeSource*, 59 F.4th at 1262, 1257. Importantly, the court explained that the challenged action "was issued in pursuit of the same goal articulated in Proclamation 9705 (extended stabilization at 80 percent of domestic capacity utilization) and in response to 'current information' provided to the President by the Secretary under the requirements for monitoring the import reductions" put in place by Proclamation 9705. *Id.*

Here, the challenged measures bear the identical hallmarks as subsequent presidential action that the Federal Circuit has affirmed as lawful: the measures are tied to the original 80 percent domestic capacity utilization goal set forth in Proclamation 9705, and the President continues to act based on non-stale information, including newly provided information from the Secretary. Thus, there is "no genuine concern about staleness." *Transpacific Steel*, 4 F.4th at 1332; *PrimeSource*, 59 F.4th at 1262.

The subsequent modifications to the steel tariff regime are still part of the original plan of action and are still tied to the original domestic capacity utilization goal. Indeed, in the challenged proclamations, the President explained that prior measures had not achieved and sustained the domestic capacity utilization goal, making additional action necessary. For example, in Proclamation 10896, the President specifically observed that the "developments and modifications to the tariffs announced in Proclamation 9705 have undermined the program's national security objectives by preventing the domestic steel industry from achieving sustained production capacity utilization of at least 80 percent." 90 Fed. Reg. at 9820, ¶ 13.

The President further explained that the proclaimed further action was in response to additional and current information received from the Secretary, including information specifically about imports of steel articles from Mexico. *Id.* at 9818-19, ¶ 7. Similarly, in Proclamation 10947, the President explained that the previously imposed tariffs "have not yet

enabled" the steel manufacturing industry "to develop and maintain the rates of capacity production utilization" that is "necessary" for the industry's "sustained health and for projected national defense needs." 90 Fed. Reg. at 24200, ¶ 6. Finally, the President explained that the modifications adopted in Proclamation 11021 were necessary "to address more effectively the threats to national security found" in Proclamation 9705, including by "encouraging companies to expand domestic production capacity of metal products." 91 Fed. Reg. at 18203, ¶ 12. Thus, the challenged measures are clearly tied to the same threat finding and goal announced in Proclamation 9705 and part of the "continuing course of action," *Transpacific*, 4 F.4th at 1318, originally announced.

The President continues to modify the continuing course of action based on non-stale information. In the initial proclamation and every subsequent proclamation, the President directed the Secretary to monitor steel imports and inform the President of any circumstances that might require further action under Section 232 to address the threat to the national security. *See, e.g.*, Proclamation 9705, 83 Fed. Reg. at 11628; Proclamation 10896, 90 Fed. Reg. at 9817, 9825 (including monitoring directive); Proclamation 10947, 90 Fed. Reg. at 24199-200, 24201-02 (same); Proclamation 11021, 91 Fed. Reg. at 18207 (same). The President acknowledged in these proclamations that the Secretary did monitor, that the Secretary provided an updated based on that monitoring, and that the President considered that newly provided and non-stale information in making the modification determination. *See, e.g.*, Proclamation 10896, 90 Fed. Reg. at 9821 ("In light of the information provided by the Secretary"); Proclamation 10947, 90 Fed. Reg. at 24200 ("After considering current information newly provided by the Secretary"); *id.* at 24199-200 ("In Proclamation 10896 and Proclamation 10895, I instructed the Secretary to continue to monitor imports of steel articles and derivative steel articles, and aluminum articles

and derivative aluminum articles, respectively, and to review the status of such imports with respect to the national security of the United States. *The Secretary has done so and has advised me accordingly.*" (emphasis added)); Proclamation 11021, 91 Fed. Reg. at 18201–02 (similar). Because the challenged modifications were "issued in pursuit of the same goal first articulated in Proclamation 9705 (extended stabilization at 80 percent of domestic capacity utilization) and in response to the current information provided to the President by the Secretary under the requirements for monitoring the import reductions that were put in place by Proclamation 9705," *PrimeSource*, 59 F.4th at 1262 (cleaned up), there is manifestly no staleness problem.

Deacero identifies nothing in the proclamations themselves to support its view of "staleness," thereby reducing its theory to one based purely upon the passage of time. Nothing in the proclamations themselves suggests that the Secretary's 2018 threat of impairment finding or the 80 percent capacity utilization objective are now stale. To the contrary: each proclamation demonstrates "presidential adherence to the key finding of a need for a certain capacity-utilization level, with no indication of staleness of that finding," *Transpacific*, 4 F.4th at 1323, and shows that the President's modifications were based on "'current information' provided to the President by the Secretary under the 'requirements for monitoring'" *PrimeSource*, 59 F.4th at 1262 (quoting *Transpacific*, 4 F.4th at 1323 & n.10). As in *Transpacific* and *PrimeSource*, the challenged proclamations were "issued in pursuit of the same goal articulated in" Proclamation 9705 and based on "current information," making them not stale regardless of the amount of time that has passed. The 2018 report's central findings and domestic capacity utilization objective continue to serve as the touchstone for Presidential action.

Deacero's theory of staleness also falls short given the President's historical exercise of Section 232 authority. Presidents have modified Section 232 actions, without receiving new

reports, far later than the length of time complained of here: seven years after the original actions were taken. *See, e.g.*, *Transpacific Steel*, 4 F.4th at 1327 ("The specific imposition initially adopted in Proclamation 3729 was modified at least 26 times before a new investigation and report were completed—16 years later in 1975. At least some of those modifications (made without a new report) radically amended the program." (cleaned up)).

For example, in Proclamation 3279, President Eisenhower established the Mandatory Oil Import Program (MOIP), a system of restrictions or quotas on imports of petroleum and petroleum products administered by the Secretary of the Interior. Proclamation 3279, *Adjusting Imports of Petroleum and Petroleum Products into the United States*, 24 Fed. Reg. 1781 (Mar. 12, 1959). That quota system was modified numerous times as Presidents sought to address growing domestic demand for oil. "From the beginning of the MOIP in 1959 until the removal of quotas in 1973, 24 proclamations were issued, making numerous modifications in the original restrictions." United States Tariff Commission, WORLD OIL DEVELOPMENTS AND U.S. OIL IMPORT POLICIES, T.C. Publication 632 at 44 (1973), *available at usitc.gov/publications/other/pub632.pdf*. And in 1973, President Nixon invoked his Section 232 authority to drastically alter the remedial actions taken on imports of petroleum products. The President suspended existing quotas on oil imports and provided for a "gradual transition from the existing quota method of adjusting imports" to a "system of fees" to be paid by oil importers for import licenses. Proclamation 4210, *Modifying Proclamation 3279 Relating to Imports of Petroleum and Petroleum Products Through a System of License Fees and Providing for Gradual Reduction of Levels of Imports of Crude Oil, Unfinished Oils and Finished Products*, 38 Fed. Reg. 9645 (Apr. 19, 1973). Considering the decades-long duration of the Section 232 measures on petroleum imports, all taken based upon initial findings by the Director of the

Office of Civil and Defense Mobilization and subsequent monitoring that informed adjustments over time, there is no credible argument that the seven years between the Secretary's report and the challenged measures renders the initial report and findings impermissibly stale, such that this Court must set aside presidential action.

B. Any Challenge To The President's Duration Determination Is Not Reviewable

In any event, the President's duration determination is committed to his discretion and thus unreviewable.[5] Deacero essentially seeks to impose an arbitrary expiration date on the validity of the Secretary's 2018 investigation, report, and findings. But Deacero's attempt fails because the expiration date of the measures speaks to "the nature and duration" of the action, which is a determination expressly reserved to the "judgment of the President." 19 U.S.C. § 1862(c)(1)(A)(ii).

Indeed, the Federal Circuit has already rejected any reading of the statute as containing externally imposed expiration dates in *USP Holdings*. There, the Federal Circuit addressed a challenge to earlier proclamations governing Section 232 measures on steel articles. *USP Holdings*, 36 F.4th at 1370. The court rejected an argument that the President had failed to determine the "nature and duration" of the adopted measures because Proclamation 9705 did not specify an end date. *Id*. at 1370–71. Given the court's "holding that the President has the 'authority to adopt and carry out a plan of action' and to adjust his ongoing approach under

[5] In deferring future challenges to Section 232 actions based on "staleness," the Federal Circuit cautioned that it was "not prejudging the scope of judicial reviewability of presidential determinations relevant to" "staleness" claims. *Transpacific*, 4 F.4th at 1332. To the extent that Deacero asks that this Court substitute its judgment for that of the President concerning the viability of the Secretary's 2018 report and findings, this request falls outside the scope of judicial review. *See USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1371 (Fed. Cir. 2022); *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1349 (Fed. Cir. 2018). Accordingly, Count I of the complaint should be dismissed.

§ 1862(c)," the Court found "no reason why the duration requirement in § 1862(c)(1)(A) must be fixed by an end date or termination criteria." *Id.* (citing *Transpacific*, 4 F.4th at 1319).

Particularly in the context of negotiated agreements with other countries, the statute anticipates that the President may need to take further action at a later date. 19 U.S.C. § 1862(c)(3)(A). The statute places no temporal restrictions on when the President may later determine that an agreement "is not being carried out or is ineffective in eliminating the threat to the national security posed by imports of such article." *Id.* § 1862(c)(3)(A)(ii). Stated succinctly, "{t}here is no textual basis for a specific time limit on adjustments under a timely adopted plan." *PrimeSource*, 59 F.4th at 1262. Instead, Section 232 clearly commits the decision on duration to the President—expressly stating that the decision is one to be made "in the judgment of the President." 19 U.S.C. § 1862(c)(1)(A)(ii); *see Dalton v. Specter*, 511 U.S. 462, 474 (1994) (explaining that judicial review is not available when the statute reserves the decision to the discretion of the President).

Even though Section 232 commits decisions on duration to the President, Deacero seeks to second-guess the President's determination. The closest Deacero comes to supporting its staleness theory is noting that in Proclamation 9894, the President indicated that, at the time, imports of steel articles from Mexico would no longer impose a threat of impairment to national security. Compl. ¶¶ 6, 82. The President's determination was, however, contingent upon the effectiveness of the measures negotiated with Mexico. The President explained that "*under the framework in the agreements*, imports of steel articles from Canada and Mexico will no longer threaten to impair the national security." 84 Fed. Reg. at 23988, ¶ 6 (emphasis added). The President specifically determined these determinations might be revisited, depending upon the effectiveness of the agreed-upon measures. *Id.* Consistent with this continuing course of action,

in 2025, the Secretary informed the President that "imports of steel articles from Canada and Mexico have increased significantly to levels that once again threaten to impair U.S. national security." Proclamation 10896, 90 Fed. Reg. at 9818–19, ¶ 7. The President also observed that "{i}ncreasing and persistently high import volumes from countries exempted from the duties . . . have captured the benefit of U.S. demand at the domestic industry's expense and transmitted harmful effects onto the domestic industry," depressing the industry's capacity utilization. *Id.* at 9818, ¶ 6. Thus, again, the challenged measures are entirely in line with the original threat finding and objectives.

III. The President Complied With 19 U.S.C. § 1862(c)(3)

Deacero's next claim is that, in proclaiming the challenged measures, the President did not comply with 19 U.S.C. § 1862(c)(3). Specifically, Deacero alleges that Proclamation 10896 "does not make a legally sufficient Mexico-specific determination that the 2019 arrangement . . . was not being carried out or was ineffective." Compl. ¶ 93. Deacero's argument fails for two independent reasons.

***First***, the President plainly complied with § 1862(c)(3). Section 1862(c)(3) provides:

> (A) If—
>
> (i) the action taken by the President under paragraph (1) is the negotiation of an agreement which limits or restricts the importation into, or the exportation to, the United States of the article that threatens to impair national security, and
>
> (ii) either—
>
> (I) no such agreement is entered into before the date that is 180 days after the date on which the President makes the determination under paragraph (1)(A) to take such action, or
>
> (II) such an agreement that has been entered into is not being carried out or is ineffective in eliminating the threat to the national security posed by imports of such article,

> the President shall take such other actions as the President deems necessary to adjust the imports of such article so that such imports will not threaten to impair the national security. The President shall publish in the Federal Register notice of any additional actions being taken under this section by reason of this subparagraph.

The President "revisited the determinations" made in specific prior proclamations, including the "alternative agreements" with "Canada and Mexico proclaimed in Proclamation 9894." Proclamation 10896, 90 Fed. Reg. at 9820, ¶ 14. The President "determine{d} that" the modifications to Proclamation 9705, including the negotiated agreement with Mexico, "failed to achieve their articulated objectives" and "undermined the program's national security objectives." *Id.* ¶ 13. These determinations were all that were required under 19 U.S.C. § 1862(c)(3)(A)(ii)(II) to enable the President to take further action on imports of steel from Mexico.

Once the President reached those determinations, § 1862(c)(3) directs the President to take "such other actions as the President deems necessary" to ensure that imports do not threaten to impair national security. The President did so by "decid{ing} that it is necessary to terminate these arrangements as of March 12, 2025." *Id.* ¶ 14. The President explained that "{r}eplacing the alternative agreements with the additional ad valorem tariffs will be a more robust and effective means of ensuring that the objectives articulated in the Secretary's January 11, 2018, report and subsequent proclamations are achieved." *Id.*

Deacero challenges the sufficiency of the explanations provided in the proclamations. It complains that the President did not explain "why" the "2019 arrangement, as modified by the July 2024 melt-and-pour regime, was not being carried out or was ineffective within the meaning of Section 232(c)(3)." Compl. ¶¶ 93–97. Section 232 does not mandate the publication of a particular level of fact-finding or analysis or require the President to "connect" the facts found to

justify the subsequent action taken. Indeed, the statute does not require that the President memorialize the determination that prior negotiated agreements are no longer effective. And Presidents are neither agencies nor required to provide detailed reasons for their decisions. *Cf. Trump v. Hawaii*, 585 U.S. 667, 685–86 (2018) (finding "questionable" that a statute that "requires the President to make a finding" also requires the President "to explain that finding with sufficient detail to enable judicial review"); *Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring in part and in the judgment).

To the contrary, the Federal Circuit has made clear that judicial review of "the President's action {under Section 232 is} for compliance with the statutory requirements delegated to him by Congress." *USP Holdings, Inc.,* 36 F.4th at 1369-70. In *USP Holdings*, the Federal Circuit rejected a request to insert into Section 232 an "imminence" requirement that Congress itself did not include. *Id.* at 1369. And in *PrimeSource*, the court emphasized that it "may not second-guess the facts found and measures taken by the President to support his adjustment," and that "there is no review of the President's pertinent factual and remedial-appropriateness determinations." 59 F.4th at 1263. Thus, Deacero's demand for more detail or public fact-finding should be rejected.

Further, "when it comes to collecting evidence and drawing inferences on questions of national security, the lack of competence on the part of the courts is marked." *Hawaii*, 585 U.S. at 704 (cleaned up). "Short of permitting cross examination of {the President} concerning his views of the Nation's security" and whether continued exemptions for steel imports from Mexico is "inimical to those interests," there is "no basis on which a reviewing court could properly assess" the President's rationale for removing the exemptions for steel imports from Mexico. *Webster v. Doe*, 486 U.S. 592, 600 (1988). Because it lacks "authority to review the President's

factual determinations," *Silfab Solar*, 892 F.3d at 1349, this Court must deny Deacero's request for further analysis.

Section 232 contains a singular publication requirement: "*notice* of any additional actions being taken under this section by reason of this subparagraph." 19 U.S.C. § 1862(c)(3)(A) (emphasis added). That notice was unquestionably provided through publication of the President's determinations in the Federal Register. Any notice deficiencies, in any event, would be harmless error. The President complied with all predicates and procedures set forth in 19 U.S.C. § 1862(c)(3).

***Second***, and in any event, the President did not have to follow § 1862(c)(3). Subsection (c)(3) merely provides an additional means for the President to modify his action under Section 232; it does not nullify the President's general authority under subsection (c)(1) to make "adjustments of specific measures, including by increasing import restrictions, in carrying out the plan over time." *Transpacific Steel*, 4 F.4th at 1319. The purpose of subsection (c)(3) is to "'spur'" Presidential action to address the identified national-security threat. *See id.* at 1329 (explaining that amendments to Section 232 were to "spur governmental action, not limit the scope of authority previously possessed" and that any limitation in subsection (c)(3) was added "so that the option would not be used for what ended up as inaction or ineffective action" (cleaned up)). There is no "substantive difference" between the President's determination that an "agreement already entered into were 'ineffective in eliminating the threat to the national security'" and "the President's declaration in the proclamation that further restrictions on imports were needed to meet the capacity-utilization target." *Transpacific Steel*, 4 F.4th at 1322 n.6 (quoting 19 U.S.C. § 1862(c)(3)(A)(ii)(II)). When, as here, the President acted to more

effectively address the national-security threat by modifying the tariff regime, the President necessarily complies with Section 232.

IV. The Complaint Fails to State a Claim Against Any Action by Commerce Or CBP

Deacero alleges that "to the extent any Commerce finding, report, recommendation, instruction, or other final agency action supplied the legal predicate for the Challenged Measures, that action did not satisfy the investigation, report, finding, timing, and procedural requirements of 19 U.S.C. § 1862(b)–(c)." Compl. ¶ 101.

The predicate authority for the President's actions was not the updated information and confidential recommendations provided by the Secretary and others. Rather, the adjustments were an extension of, and supported by, the Secretary's 2018 investigation and report. *See* Proclamation 10896, 90 Fed. Reg. at 9817, ¶ 1; 9821, ¶ 18. Subsequent guidance and updated information "is not part of a legally required and legally consequential decision of the Secretary." *PrimeSource*, 59 F.4th at 1262-63. Such guidance is therefore not a matter before this Court.

Nor is any implementing action by CBP independently reviewable by this Court. CBP's *implementation* of the President's proclamations, issued pursuant to the President's statutory authority, is ministerial in nature and not reviewable under the Administrative Procedure Act (APA). *Axle of Dearborn, Inc. v. Dep't of Com.*, No. 25-00091, 2026 Ct. Int'l Trade LEXIS 117 slip op. 26–94, *35–36 (Aug. 13, 2026) (citing *Franklin*, 505 U.S. at 800–01). The complaint does not allege that CBP took any independent final agency action; rather, Deacero concedes that

CBP's role is to "collect, administer, and enforce" the collection and assessment of Section 232 duties. Compl. ¶ 33. This Court must dismiss Count III of the complaint.[6]

## V. In Light of *Algonquin* and *PrimeSource*, Deacero's Non-Delegation Claim Must Be Dismissed

Deacero also contends that Section 232 "confers effectively unbounded tariff authority without an intelligible principle or enforceable limitation," Compl. ¶ 111, contrary to the constitutional principle of separation of powers. This argument is likewise unpersuasive.

The non-delegation doctrine is based on the principle of preserving the separation of powers between the three branches of government. As the Supreme Court recently emphasized in denying a non-delegation challenge, the "{l}egislative power . . . belongs to the legislative branch, and to no other." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 672 (2025). But "Congress may seek assistance from its coordinate branches to secure the effect intended by its acts of legislation." *Id.* (citation modified). In seeking assistance from other branches of government, Congress may "vest discretion" in the Executive Branch "to implement and apply the laws it has enacted." *Id.* (citation modified). So long as Congress sets forth an "intelligible principle" to guide the Executive, it effects a lawful grant of discretion rather than an unlawful delegation of legislative power. *Id.* at 673 (citation modified).

The Supreme Court has already concluded that Section 232 provides that intelligible principle, which means that Deacero's non-delegation challenge must fail. *Algonquin*, 426 U.S. at 559–560. The Supreme Court considered the constitutionality of Section 232 and concluded that "the standards that {Section 232} provides the President in its implementation are clearly

[6] Deacero seeks an order directing CBP to refund Section 232 duties paid, or to reliquidate entries without assessment of Section 232 duties. Compl. ¶ 104; Prayer for Relief at p. 26. Because the complaint should be dismissed, the Court need not reach the question of remedy.

sufficient to meet any delegation doctrine attack." *Id*. at 559. *Algonquin* involved a challenge to the President's imposition of a license fee on imports of petroleum and petroleum products and the claim that imposition of the fees was "beyond the President's constitutional and statutory authority." 426 U.S. at 556. In upholding the license fees, the Supreme Court rejected the contention that Section 232 raised "a serious question of unconstitutional delegation of legislative power," holding instead that the statute "easily fulfills" the intelligible principle requirement. *Id*. at 559.

The Court observed that Section 232 "establishes clear preconditions to Presidential action," including a finding by the Secretary that an "article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security." *Id*. The Court explained that Section 232 "{a}rticulates a series of factors to be considered by the President in exercising his authority." The Court concluded that "the leeway that the statute gives the President in deciding what action to take in the event the preconditions are fulfilled is far from unbounded"; "[t]he President can act only to the extent 'he deems necessary to adjust the imports of such article and its derivatives so that such imports will not threaten to impair the national security.'" For these reasons, the Court found "no looming problem of improper delegation." *Id*. at 559-60.

As directly controlling precedent, *Algonquin* binds this Court. *Mallory v. Norfolk S. Ry. Co*., 600 U.S. 122, 136 (2023). *Algonquin*'s holding, that Section 232 is a constitutional delegation of authority, remains good law.[7] In cases challenging earlier proclamations on

[7] In distinguishing Section 232 from the International Emergency Economic Powers Act (IEEPA), Justice Gorsuch's concurring opinion in *Learning Resources, Inc. v. Trump* emphasized that "{e}ven when {*Algonquin*} came along in 1976, the Court upheld President Ford's imposition of monetary exactions on a single class of products under *a statute that*

Section 232 measures on imports of steel articles, the Federal Circuit confirmed that *Algonquin* resolves the question of whether Section 232 is a permissible delegation of authority to the President. *See PrimeSource*, 59 F.4th at 1263; *USP Holdings*, 36 F.4th at 1365; *Am. Inst. for Int'l Steel, Inc. v. United States*, 806 F. App'x 982, 988 (Fed. Cir. 2020) ("*Algonquin* controls").

*PrimeSource* did not suggest that, when faced with different facts, the Court could reach a different conclusion on non-delegation. *See* Compl. ¶ 109. Nor could it. "In a delegation challenge, the constitutional question is whether *the statute* has delegated legislative power to the agency." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (emphasis added); *see also Zemel v. Rusk*, 381 U.S. 1, 6 (1965) ("in arguing invalid delegation, appellant has quite clearly assailed the statutes themselves"). Resolution of a non-delegation challenge, therefore, turns on the text of the statute. On the text of the statute, Section 232 remains a permissible delegation. *PrimeSource*, 59 F.4th at 1263. This Court must reach the same conclusion.

## CONCLUSION

For these reasons, we respectfully request that the Court dismiss the complaint for failure to state a claim and enter judgment in favor of the United States.

Respectfully submitted,

JONATHAN D. GUYNN
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

---

*provided at least some guidance about how he should implement the law*." 607 U.S. 229, 293 (2026) (Gorsuch, J., concurring) (emphasis added).

OF COUNSEL:

B. KATHRYN DEBRASON
RACHEL MORRIS
Attorney Advisors
Office of the Chief Counsel for
Industry & Security
Department of Commerce

/s/Tara K. Hogan
TARA K. HOGAN
Assistant Director
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20044
Tel.: (202) 616-2228
Email: tara.hogan@usdoj.gov

November 24, 2026

Attorneys for Defendants

# ADDENDUM

## 19 U.S.C. § 1862

such continuance of existing duty-free or excise treatment, or such additional import restrictions, as he determines to be required or appropriate to carry out any such trade agreement.

**(b) Restrictions on decrease or increase in rate of duty**

Except as otherwise provided in this subchapter, no proclamation pursuant to subsection (a) shall be made—

(1) decreasing any rate of duty to a rate below 50 percent of the rate existing on July 1, 1962; or

(2) increasing any rate of duty to (or imposing) a rate more than 50 percent above the rate existing on July 1, 1934.

(Pub. L. 87–794, title II, § 201, Oct. 11, 1962, 76 Stat. 872.)

**Statutory Notes and Related Subsidiaries**

WOOD-WIND AND PARTS OF WOOD-WIND INSTRUMENTS

Pub. L. 90–234, § 2(b)(2), Dec. 30, 1967, 81 Stat. 752, provided that: "The amendments made by the first section of this Act, insofar as such amendments relate to items 725.24 and 726.70 of the Tariff Schedules of the United States, shall not affect the authority of the President contained in section 201(a)(2) of the Trade Expansion Act of 1962 [subsec. (a)(2) of this section]."

DICYANDIAMIDE AND LIMESTONE: DUTY-FREE ENTRY

Duty-free treatment pursuant to this chapter of dicyandiamide in item 425.40 and limestone when imported for use in manufacture of cement in item 513.34 of the Tariff Schedules of the United States, by provision for non-application of subsec. (b)(1) of this section, see section 1823 of this title.

## § 1822. Repealed. Pub. L. 93–618, title VI, § 602(d), Jan. 3, 1975, 88 Stat. 2072

Section, Pub. L. 87–794, title II, § 202, Oct. 11, 1962, 76 Stat. 872, made special provision for low-rate articles.

## § 1823. Waiver of limitation on decrease in duty and negotiation and staging requirements for dicyandiamide and limestone

For purposes of the Trade Expansion Act of 1962 [19 U.S.C. 1801 et seq.], section 201(b)(1) [19 U.S.C. 1821(b)(1)] (relating to limit on decrease in duty), sections 221, 223, and 224 [19 U.S.C. 1841, 1843, 1844] (relating to certain requirements concerning negotiations), and section 253 [19 U.S.C. 1883] (relating to staging requirements) of such Act shall not apply with respect to dicyandiamide provided for in item 425.40 of the Tariff Schedules of the United States, and shall not apply with respect to limestone, when imported to be used in the manufacture of cement, provided for in item 513.34 of such Schedules.

(Pub. L. 90–14, May 5, 1967, 81 Stat. 14.)

**Editorial Notes**

REFERENCES IN TEXT

The Trade Expansion Act of 1962, referred to in text, is Pub. L. 87–794, Oct. 11, 1962, 76 Stat. 872, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 1801 of this title and Tables.

Sections 221, 223, 224 and 253 of the Trade Expansion Act of 1962, referred to in text, were repealed by Pub. L. 93–618, title VI, § 602(d), Jan. 3, 1975, 88 Stat. 2072.

The Tariff Schedules of the United States, referred to in text, to be treated as a reference to the Harmonized Tariff Schedule pursuant to section 3012 of this title. The Harmonized Tariff Schedule is not set out in the Code. See Publication of Harmonized Tariff Schedule note set out under section 1202 of this title.

CODIFICATION

Section was not enacted as part of the Trade Expansion Act of 1962 which is classified principally to this chapter.

PART II—EUROPEAN ECONOMIC COMMUNITY

## §§ 1831 to 1833. Repealed. Pub. L. 93–618, title VI, § 602(d), Jan. 3, 1975, 88 Stat. 2072

Section 1831, Pub. L. 87–794, title II, § 211, Oct. 11, 1962, 76 Stat. 873, made provision for trade agreements with the European Economic Community.

Section 1832, Pub. L. 87–794, title II, § 212, Oct. 11, 1962, 76 Stat. 874, made special provision for trade agreements covering agricultural commodities.

Section 1833, Pub. L. 87–794, title II, § 213, Oct. 11, 1962, 76 Stat. 874, made special provision for trade agreements covering tropical agricultural and forestry commodities.

PART III—REQUIREMENTS CONCERNING NEGOTIATIONS

## §§ 1841 to 1846. Repealed. Pub. L. 93–618, title VI, § 602(d), Jan. 3, 1975, 88 Stat. 2072

Section 1841, Pub. L. 87–794, title II, § 221, Oct. 11, 1962, 76 Stat. 874, made provision for the giving of advice by the Tariff Commission [now the United States International Trade Commission] concerning trade agreements. See section 2151 of this title.

Section 1842, Pub. L. 87–794, title II, § 222, Oct. 11, 1962, 76 Stat. 875, made provision for the giving of advice by other sources concerning trade agreements. See section 2152 of this title.

Section 1843, Pub. L. 87–794, title II, § 223, Oct. 11, 1962, 76 Stat. 875, provided for public hearings in connection with proposed trade agreements. See section 2153 of this title.

Section 1844, Pub. L. 87–794, title II, § 224, Oct. 11, 1962, 76 Stat. 875, set out prerequisites for offers for modification or continuance of duties or other import restrictions, or continuance of duty-free or excise treatment. See section 2154 of this title.

Section 1845, Pub. L. 87–794, title II, § 225, Oct. 11, 1962, 76 Stat. 876, provided for the reservation of articles from trade negotiations. See section 2137 of this title.

Section 1846, Pub. L. 87–794, title II, § 226, Oct. 11, 1962, 76 Stat. 876, provided for the transmission of agreements to Congress. See section 2212 of this title.

PART IV—NATIONAL SECURITY

## § 1861. Repealed. Pub. L. 93–618, title VI, § 602(d), Jan. 3, 1975, 88 Stat. 2072

Section, Pub. L. 87–794, title II, § 231, Oct. 11, 1962, 76 Stat. 876; Pub. L. 88–205, pt. IV, § 402, Dec. 16, 1963, 77 Stat. 390, covered products of Communist countries or areas.

## § 1862. Safeguarding national security

**(a) Prohibition on decrease or elimination of duties or other import restrictions if such reduction or elimination would threaten to impair national security**

No action shall be taken pursuant to section 1821(a) of this title or pursuant to section 1351 of this title to decrease or eliminate the duty or other import restrictions on any article if the

President determines that such reduction or elimination would threaten to impair the national security.

**(b) Investigations by Secretary of Commerce to determine effects on national security of imports of articles; consultation with Secretary of Defense and other officials; hearings; assessment of defense requirements; report to President; publication in Federal Register; promulgation of regulations**

(1)(A) Upon request of the head of any department or agency, upon application of an interested party, or upon his own motion, the Secretary of Commerce (hereafter in this section referred to as the "Secretary") shall immediately initiate an appropriate investigation to determine the effects on the national security of imports of the article which is the subject of such request, application, or motion.

(B) The Secretary shall immediately provide notice to the Secretary of Defense of any investigation initiated under this section.

(2)(A) In the course of any investigation conducted under this subsection, the Secretary shall—

(i) consult with the Secretary of Defense regarding the methodological and policy questions raised in any investigation initiated under paragraph (1),

(ii) seek information and advice from, and consult with, appropriate officers of the United States, and

(iii) if it is appropriate and after reasonable notice, hold public hearings or otherwise afford interested parties an opportunity to present information and advice relevant to such investigation.

(B) Upon the request of the Secretary, the Secretary of Defense shall provide the Secretary an assessment of the defense requirements of any article that is the subject of an investigation conducted under this section.

(3)(A) By no later than the date that is 270 days after the date on which an investigation is initiated under paragraph (1) with respect to any article, the Secretary shall submit to the President a report on the findings of such investigation with respect to the effect of the importation of such article in such quantities or under such circumstances upon the national security and, based on such findings, the recommendations of the Secretary for action or inaction under this section. If the Secretary finds that such article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, the Secretary shall so advise the President in such report.

(B) Any portion of the report submitted by the Secretary under subparagraph (A) which does not contain classified information or proprietary information shall be published in the Federal Register.

(4) The Secretary shall prescribe such procedural regulations as may be necessary to carry out the provisions of this subsection.

**(c) Adjustment of imports; determination by President; report to Congress; additional actions; publication in Federal Register**

(1)(A) Within 90 days after receiving a report submitted under subsection (b)(3)(A) in which the Secretary finds that an article is being imported into the United States in such quantities or under such circumstances as to threaten to impair the national security, the President shall—

(i) determine whether the President concurs with the finding of the Secretary, and

(ii) if the President concurs, determine the nature and duration of the action that, in the judgment of the President, must be taken to adjust the imports of the article and its derivatives so that such imports will not threaten to impair the national security.

(B) If the President determines under subparagraph (A) to take action to adjust imports of an article and its derivatives, the President shall implement that action by no later than the date that is 15 days after the day on which the President determines to take action under subparagraph (A).

(2) By no later than the date that is 30 days after the date on which the President makes any determinations under paragraph (1), the President shall submit to the Congress a written statement of the reasons why the President has decided to take action, or refused to take action, under paragraph (1). Such statement shall be included in the report published under subsection (e).

(3)(A) If—

(i) the action taken by the President under paragraph (1) is the negotiation of an agreement which limits or restricts the importation into, or the exportation to, the United States of the article that threatens to impair national security, and

(ii) either—

(I) no such agreement is entered into before the date that is 180 days after the date on which the President makes the determination under paragraph (1)(A) to take such action, or

(II) such an agreement that has been entered into is not being carried out or is ineffective in eliminating the threat to the national security posed by imports of such article,

the President shall take such other actions as the President deems necessary to adjust the imports of such article so that such imports will not threaten to impair the national security. The President shall publish in the Federal Register notice of any additional actions being taken under this section by reason of this subparagraph.

(B) If—

(i) clauses (i) and (ii) of subparagraph (A) apply, and

(ii) the President determines not to take any additional actions under this subsection,

the President shall publish in the Federal Register such determination and the reasons on which such determination is based.

**(d)[1] Domestic production for national defense; impact of foreign competition on economic welfare of domestic industries**

For the purposes of this section, the Secretary and the President shall, in the light of the requirements of national security and without ex-

[1] So in original. There are two subsecs. designated (d). Second subsec. (d) probably should be designated (e).

cluding other relevant factors, give consideration to domestic production needed for projected national defense requirements, the capacity of domestic industries to meet such requirements, existing and anticipated availabilities of the human resources, products, raw materials, and other supplies and services essential to the national defense, the requirements of growth of such industries and such supplies and services including the investment, exploration, and development necessary to assure such growth, and the importation of goods in terms of their quantities, availabilities, character, and use as those affect such industries and the capacity of the United States to meet national security requirements. In the administration of this section, the Secretary and the President shall further recognize the close relation of the economic welfare of the Nation to our national security, and shall take into consideration the impact of foreign competition on the economic welfare of individual domestic industries; and any substantial unemployment, decrease in revenues of government, loss of skills or investment, or other serious effects resulting from the displacement of any domestic products by excessive imports shall be considered, without excluding other factors, in determining whether such weakening of our internal economy may impair the national security.

**(d)** [1] **Report by Secretary of Commerce**

(1) Upon the disposition of each request, application, or motion under subsection (b), the Secretary shall submit to the Congress, and publish in the Federal Register, a report on such disposition.

(2) Omitted.

**(f) Congressional disapproval of Presidential adjustment of imports of petroleum or petroleum products; disapproval resolution**

(1) An action taken by the President under subsection (c) to adjust imports of petroleum or petroleum products shall cease to have force and effect upon the enactment of a disapproval resolution, provided for in paragraph (2), relating to that action.

(2)(A) This paragraph is enacted by the Congress—

(i) as an exercise of the rulemaking power of the House of Representatives and the Senate, respectively, and as such is deemed a part of the rules of each House, respectively, but applicable only with respect to the procedures to be followed in that House in the case of disapproval resolutions and such procedures supersede other rules only to the extent that they are inconsistent therewith; and

(ii) with the full recognition of the constitutional right of either House to change the rules (so far as relating to the procedure of that House) at any time, in the same manner, and to the same extent as any other rule of that House.

(B) For purposes of this subsection, the term "disapproval resolution" means only a joint resolution of either House of Congress the matter after the resolving clause of which is as follows: "That the Congress disapproves the action taken under section 232 of the Trade Expansion Act of 1962 with respect to petroleum imports under ____________ dated ____________.", the first blank space being filled with the number of the proclamation, Executive order, or other Executive act issued under the authority of subsection (c) of this section for purposes of adjusting imports of petroleum or petroleum products and the second blank being filled with the appropriate date.

(C)(i) All disapproval resolutions introduced in the House of Representatives shall be referred to the Committee on Ways and Means and all disapproval resolutions introduced in the Senate shall be referred to the Committee on Finance.

(ii) No amendment to a disapproval resolution shall be in order in either the House of Representatives or the Senate, and no motion to suspend the application of this clause shall be in order in either House nor shall it be in order in either House for the Presiding Officer to entertain a request to suspend the application of this clause by unanimous consent.

(Pub. L. 87–794, title II, § 232, Oct. 11, 1962, 76 Stat. 877; Pub. L. 93–618, title I, § 127(d), Jan. 3, 1975, 88 Stat. 1993; Pub. L. 96–223, title IV, § 402, Apr. 2, 1980, 94 Stat. 301; Pub. L. 100–418, title I, § 1501(a), (b)(1), Aug. 23, 1988, 102 Stat. 1257, 1259.)

**Editorial Notes**

REFERENCES IN TEXT

Section 232 of the Trade Expansion Act of 1962, referred to in subsec. (f)(2)(B), is classified to this section.

CODIFICATION

Subsection (d)(2), which required the President to submit an annual report to Congress on the operation of this section, terminated, effective May 15, 2000, pursuant to section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance. See, also, page 28 of House Document No. 103–7.

AMENDMENTS

1988—Subsec. (b). Pub. L. 100–418, § 1501(a)(3), in adding subsec. (b) and striking out former subsec. (b) relating to similar subject matter, changed structure of subsec. (b) from a single unnumbered par. to one consisting of pars. (1) to (4).

Subsec. (c). Pub. L. 100–418, § 1501(a)(2), (3), added subsec. (c) and redesignated former subsec. (c) as (d).

Subsec. (d). Pub. L. 100–418, § 1501(b)(1), redesignated subsec. (e), as redesignated by section 1501(a)(2) of Pub. L. 100–418, as subsec. (d) and amended it generally. Prior to amendment, subsec. (d) read as follows: "A report shall be made and published upon the disposition of each request, application, or motion under subsection (b) of this section. The Secretary shall publish procedural regulations to give effect to the authority conferred on him by subsection (b) of this section."

Pub. L. 100–418, § 1501(a)(2), redesignated subsec. (c), relating to domestic production for national defense and the impact of foreign competition on economic welfare of domestic industries, as (d). Former subsec. (d), relating to reports on investigations by Secretary of Commerce, redesignated (e).

Subsec. (e). Pub. L. 100–418, § 1501(b)(1), redesignated subsec. (e), as redesignated by section 1501(a)(2) of Pub. L. 100–418, as subsec. (d) and amended it generally.

Pub. L. 100–418, § 1501(a)(2), redesignated subsec. (d), relating to reports on investigations by Secretary of Commerce, as (e). Former subsec. (e) redesignated (f).

Subsec. (f). Pub. L. 100–418, § 1501(a)(1), (2), redesignated subsec. (e) as (f), and substituted reference to subsec. (c) of this section for reference to subsec. (b) of this section in pars. (1) and (2)(B).

1980—Subsec. (e). Pub. L. 96–223 added subsec. (e).

1975—Subsec. (b). Pub. L. 93–618, § 127(d)(1)–(3), substituted "Secretary of the Treasury (hereinafter referred to as the 'Secretary')" for "Director of the Office of

Emergency Planning (hereinafter in this section referred to as the 'Director')", substituted "advice from, and shall consult with, the Secretary of Defense, the Secretary of Commerce, and other appropriate officers of the United States" for "advice from other appropriate departments and agencies", inserted provision for public hearings by the Secretary as part of his investigation, inserted requirement that the Secretary report to the President when he recommends inaction in the same way that a report to the President is required when he recommends action under this section, and placed a 1-year time limit on the Secretary's investigation before making his recommendation to the President.

Subsecs. (c), (d). Pub. L. 93–618, § 127(d)(4), substituted "Secretary" for "Director".

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 1988 AMENDMENT

Pub. L. 100–418, title I, § 1501(d), Aug. 23, 1988, 102 Stat. 1259, provided that:

"(1) Except as otherwise provided under this subsection, the amendments made by this section [amending this section and repealing section 1863 of this title] shall apply with respect to investigations initiated under section 232(b) of the Trade Expansion Act of 1962 [19 U.S.C. 1862(b)] on or after the date of enactment of this Act [Aug. 23, 1988].

"(2) The provisions of subsection (c) of section 232 of the Trade Expansion Act of 1962, as amended by this section, shall apply with respect to any report submitted by the Secretary of Commerce to the President under section 232(b) of such Act after the date of enactment of this Act.

"(3) By no later than the date that is 90 days after the date of enactment of this Act, the President shall make the determinations described in section 232(c)(1)(A) of the Trade Expansion Act of 1962, as amended by this section, with respect to any report—

"(A) which was submitted by the Secretary of Commerce to the President under section 232(b) of such Act before the date of enactment of this Act, and

"(B) with respect to which no action has been taken by the President before the date of enactment of this Act."

PETROLEUM IMPORT ADJUSTMENT PROGRAM; OIL IMPORT FEE OF APRIL 2, 1980; CESSATION OF FORCE AND EFFECT OF PRESIDENTIAL ACTION

Pub. L. 96–264, § 2, June 6, 1980, 94 Stat. 439, provided that: "Notwithstanding any other provision of law, the action taken by the President under section 232(b) of the Trade Expansion Act of 1962 (19 U.S.C. 1862(b)) with respect to petroleum imports under Proclamation 4744, dated April 2, 1980, as amended [formerly set out below], shall cease to have force and effect upon the date of the enactment of this Act [June 6, 1980]."

**Executive Documents**

PROCLAMATION NO. 3279

Proc. No. 3279, Mar. 10, 1959, 24 F.R. 1781, as amended by Proc. No. 3290, Apr. 30, 1959, 24 F.R. 3527; Proc. No. 3328, Dec. 10, 1959, 24 F.R. 10133; Proc. No. 3386, Dec. 24, 1960, 25 F.R. 13945; Proc. No. 3389, Jan. 17, 1961, 26 F.R. 507; Ex. Ord. No. 11051, Sept. 27, 1962, 27 F.R. 9683; Proc. No. 3509, Nov. 30, 1962, 27 F.R. 11985; Proc. No. 3531, Apr. 19, 1963, 28 F.R. 4077; Proc. No. 3541, June 12, 1963, 28 F.R. 5931; Proc. No. 3693, Dec. 10, 1965, 30 F.R. 15459; Proc. No. 3779, Apr. 10, 1967, 32 F.R. 5919; Proc. No. 3794, July 17, 1967, 32 F.R. 10547; Proc. No. 3820, Nov. 9, 1967, 32 F.R. 15701; Proc. No. 3823, Jan. 29, 1968, 33 F.R. 1171; Proc. No. 3969, Mar. 10, 1970, 35 F.R. 4321; Proc. No. 3990, June 17, 1970, 35 F.R. 10091; Proc. No. 4018, Oct. 16, 1970, 35 F.R. 16357; Proc. No. 4025, Dec. 22, 1970, 35 F.R. 19391; Proc. No. 4092, Nov. 5, 1971, 36 F.R. 21397; Proc. No. 4099, Dec. 20, 1971, 36 F.R. 24203; Proc. No. 4133, May 11, 1972, 37 F.R. 9543; Proc. No. 4156, Sept. 18, 1972, 37 F.R. 19115; Proc. No. 4175, Dec. 16, 1972, 37 F.R. 28043; Proc. No. 4178, Jan. 17, 1973, 38 F.R. 1719; Ex. Ord. No. 11703, Feb. 7, 1973, 38 F.R. 3579; Proc. No. 4202, Mar. 23, 1973, 38 F.R. 7977; Proc. No. 4210, Apr. 18, 1973, 38 F.R. 9645; Proc. No. 4227, June 19, 1973, 38 F.R. 16195; Ex. Ord. No. 11743, Oct. 23, 1973, 38 F.R. 29459; Ex. Ord. No. 11775, Mar. 26, 1974, 39 F.R. 11415; Ex. Ord. No. 11790, June 25, 1974, 39 F.R. 23185; Proc. No. 4317, Sept. 27, 1974, 39 F.R. 35103; Proc. No. 4341, Jan. 23, 1975, 40 F.R. 3965; Proc. No. 4355, Mar. 4, 1975, 40 F.R. 10437; Proc. No. 4370, Apr. 30, 1975, 40 F.R. 19421; Proc. No. 4377, May 27, 1975, 40 F.R. 23429; Proc. No. 4412, Jan. 3, 1976, 41 F.R. 1037; Proc. No. 4543, Dec. 27, 1977, 42 F.R. 64849; Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4947; Proc. No. 4629, Dec. 8, 1978, 43 F.R. 58077; Proc. No. 4655, Apr. 6, 1979, 44 F.R. 21243; Proc. No. 4702, Nov. 12, 1979, 44 F.R. 65581; Proc. No. 4744, Apr. 2, 1980, 45 F.R. 22864; Proc. No. 4766, June 19, 1980, 45 F.R. 41899; Proc. No. 4907, Mar. 10, 1982, 47 F.R. 10507, which set forth regulations governing the licensing of imports of petroleum and petroleum products, was revoked by Proc. No. 5141, Dec. 22, 1983, 48 F.R. 56929, set out below.

PROCLAMATION NO. 4744

Proc. No. 4744, Apr. 2, 1980, 45 F.R. 22864, as amended by Proc. No. 4748, Apr. 11, 1980, 45 F.R. 25371; Proc. No. 4751, Apr. 23, 1980, 45 F.R. 27905, which related to the petroleum import adjustment program, was rescinded by Proc. No. 4766, June 19, 1980, 45 F.R. 41899, effective Mar. 15, 1980.

PROCLAMATION NO. 4762

Proc. No. 4762, June 6, 1980, 45 F.R. 39237, relating to petroleum import licensing requirements, was revoked by Proc. No. 4766, June 19, 1980, 45 F.R. 41899.

PROC. NO. 5141. IMPORTS OF PETROLEUM AND PETROLEUM PRODUCTS

Proc. No. 5141, Dec. 22, 1983, 48 F.R. 56929, provided:

The Secretary of Energy has advised me that no purpose is currently served by the existing system of licensing of imports of petroleum and petroleum products. The Secretary of Energy also recommends that I retain the current prohibition on imports of Libyan crude oil into the United States, its territories and possessions, which was adopted in Proclamation No. 4907 [amending Proc. No. 3279, formerly set out above], on the ground that such imports would be inimical to the United States national security. The Secretary further recommends that he continue to monitor imports of petroleum and petroleum products in order to be able to advise me as to the need for further action, as appropriate, under Section 232 of the Trade Expansion Act of 1962, as amended [this section].

I agree with the recommendations of the Secretary of Energy.

NOW, THEREFORE, I, RONALD REAGAN, President of the United States of America, by the authority vested in me by the Constitution and laws of the United States, including Section 232 of the Trade Expansion Act of 1962, as amended (19 U.S.C. 1862), do hereby proclaim that:

SECTION 1. Proclamation No. 3279, as amended, is revoked.

SEC. 2. The Secretary of Energy shall continue to monitor imports of petroleum and petroleum products and shall, from time to time, in consultation with the Secretary of State, the Secretary of Commerce, and such other federal agencies as he deems appropriate, review the status of such imports with respect to the national security. The Secretary shall inform the President of any circumstances which in his opinion might indicate the need for further action by the President under Section 232 of the Trade Expansion Act [this section].

SEC. 3. (a) No crude oil produced in Libya may be imported into the United States, its territories or possessions.

(b) The Secretary of the Treasury may issue such regulations and interpretations as he deems necessary to implement this section.

SEC. 4. The Secretary of Energy may continue to consider requests for refund of fees paid under Proclamation